### UNITED STATES v. FOOD AND GROCERY BUREAU OF SOUTHERN CALIFORNIA, Inc., et al.

No. 14952–Y.

District Court, S. D. California, Central Division.

March 24, 1942.

Tom C. Clark, Alfred C. Ackerson, George R. Maury, Robert J. Rubin, Sheridan Morgan, Paul Meyers, Perry H. Taft, and Homer H. Bell, Sp. Assts. to Atty. Gen., all of Los Angeles, Cal., for plaintiff.

Cupp, Hunt & Henderson, by J. Wesley Cupp, all of Los Angeles, Cal., for Food and Grocery Bureau of Southern California, Inc., S. M. White, Clarence A. Plumridge, Roy J. Porter, and Carl M. Grayson.

Cupp, Hunt & Henderson, by J. Wesley Cupp, and Otto Christensen and Eugene Sax, all of Los Angeles, Cal., for Myer Pransky.

Mitchell, Johnson & Ludwick, Byron C. Hanna, and James Kirby, all of Los Angeles, Cal., for Clayton Whiteman, Sam Seelig, Henry J. Carty, T. I. Lingo, and Miller Allen.

D. C. Montgomery and Otto Christensen, both of Los Angeles, Cal., for Harold R. Zenor and George Hagmann, Jr.

YANKWICH, District Judge.

The opinion on the demurrer (United States v. Food and Grocery Bureau et al., D.C.Cal., 1941, 41 F.Supp. 884) abstracts the allegations of the indictment. The opinion on the motions to dismiss and to strike (United States v. Food and Grocery Bureau et al., D.C.Cal., 43 F.Supp. 966, filed March 11, 1942) outlines the Government's proof.

So, in stating the grounds for the verdict to be announced, we may start, both factually and legally, where we left off in those two opinions.

In a famous English prosecution for a criminal libel against Parliament, in which, although publication had been proved, the jury had found the defendant not guilty, the trial judge, at the insistence of the attorney for the Crown, asked the jury whether they had found the defendant not guilty "because publication had not been proved." The answer of the jury has become a classic. Through the foreman, they answered: "Not guilty, not guilty. That is our verdict, my Lord, and we abide by it". Rex v. Owen, 1752, 18 Howell, State Trials, 1203.

One familiar with the law of criminal libel as it then stood, can understand the importance of the answer and the courage of the jury in giving it. Truth was not a defense. And when publication was proved, the offense was complete. Had the jurors answered the Court's question affirmatively, their answer could have been considered a special verdict, and the verdict of not guilty nullified. Had they answered it negatively, they would have stood impeached. For publication had been proved. By giving this courageous answer, these twelve men who, as the record of the case shows, were drapers and other tradesmen, not only saved their verdict, but wrote a glorious incident in the history of trial by jury in the English-speaking world, and in the history of free speech. They vindicated the right

of the jury, as judges of both the law and the facts, to best serve the interests of the social order by using their power of acquittal to uphold freedom of expression at a time when harsh judicial doctrines originating in the Court of Star Chamber (De Libellis Famosis, 1609, 5 Rep. 125) stood in its way by declining to allow truth from good motives as a defense in criminal libel. See, Hudson's Treatise on the Court of Star Chamber, Part II, Ch. XI in Collectanea Juridica, Vol. 2, pp. 100-104; Cf. Yankwich, Essays in the Law of Libel, 1929, pp. 103 et seq., 267–272.

I think of this incident every time I am called upon to decide a criminal case of importance which is tried without a jury. I bear in mind what counsel endeavor to do to the Court's reasons when the case reaches a higher court and the rather slighting manner in which some appellate courts refer to what they call (always in quotation marks) "opinions" in criminal cases. Some state that, strictly speaking, the "reasons" for the verdict are not "a part of the record". People v. Grana, 1934, 1 Cal.2d 565, 570, 36 P.2d 375, 378. Theoretically, this is, no doubt, true. Yet, I believe, after a rather long experience as a trial judge in one community, during which time I have tried many criminal cases of significance without a jury, that, as trial judges, we owe it not only to the government, the defendants, and their attorneys, but also to the community as a whole, not to hide behind the formula of a general verdict, but to state the foundations for our conclusions. They may carry no conviction to a higher court. And they may be in the same category as all reasons given by a trial judge. Ultimately a trial judge speaks to the higher court through his judgment: His judgment may be good and his reasoning bad. Or his reasoning may be good and his judgment bad. This is the foundation for the warning which, according to the old legal story, an older judge gave to the younger "to give judgments, but never to give reasons."

I am not a believer in this doctrine. And I have sought consistently with the newer concept of judicial ethics (see Canon 19, Canons of Professional and Judicial Ethics, American Bar Association, adopted August 27, 1909) in every cause, civil or criminal, to inform litigants and their counsel of the grounds for decision. So this is my apologia for following the practice in this case.

In any case arising under the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, which punishes contracts, combinations or conspiracies "in restraint of trade or commerce among the several States", the nature of commerce is vital. I have always been of the view that the difficulty which sometimes confronts us in attempting to reconcile the various definitions of "commerce" in the decisions of the Supreme Court derives from the fact that the Court does not always use the same touchstone in assaying what is and what is not commerce. The Court adopts one norm when dealing with the power of the State to tax. See Heisler v. Thomas Colliery Co., 1922, 260 U.S. 245, 43 S.Ct. 83, 67 L.Ed. 237; Henneford v. Silas Mason Co., 1937, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814; Felt & Tarrant Co. v. Gallagher, 1939, 306 U. S. 62, 59 S.Ct. 376, 83 L.Ed. 488; Southern Pacific Co. v. Gallagher, 1939, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586; Ford Motor Co. v. Beauchamp, 1939, 308 U.S. 331, 60 S.Ct. 273, 84 L.Ed. 304; People of California v. Thompson, 1941, 313 U.S. 109, 61 S.Ct. 930, 85 L.Ed. 1219. Under it, it is willing to concede the right of the State to regulate or tax articles originating in interstate commerce, even during the momentary pause when they come to rest in the state, and before they resume the continuity of movement in interstate commerce. When, however, it approaches the problem from the other angle—control by the federal government—it is not so meticulous in observing the dividing line between intrastate and interstate activities. National Labor Relations Board v. Jones & Laughlin Corp., 1931, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; United States v. Darby, 1941, 312 U.S. 100, 657, 61 S.Ct. 451, 85 L.Ed. 609, 132 A.L.R. 1430; United States v. Wrightwood Dairy Co., 1942, 62 S.Ct. 523, 86 L. Ed. ——; Illinois Natural Gas Co. v. Central Illinois Public Service Co., 1942, 62 S.Ct. 384, 86 L.Ed. ——.

When the governmental power to control commerce takes the form of criminal legislation, courts hark back to the proposition declared early in our judicial history, that the constitutional grant of control of commerce between the States, Article I, Sec. 8, Clause 3, Constitution of the United States, gives the Congress a power which is both plenary and absolute, with the primacy of the federal government beyond challenge. See Gibbons v.

Ogden, 1824, 9 Wheat. 1, 196, 6 L.Ed. 23; United States v. Rock Royal Co-Operative, Inc., 1939, 307 U.S. 533, 569, 59 S.Ct. 993, 83 L.Ed. 1446. Anti-trust legislation is of this character. It seeks to prevent interference with interstate commerce through combinations and to destroy practices injurious to it. It expresses an economic philosophy which holds that competition best serves the national economy by preserving freedom to trade. United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443; Paramount Famous Lasky Corp. v. United States, 1930, 282 U.S. 30, 42, 51 S.Ct. 42, 75 L.Ed. 145.

■ For the purpose of delimiting the respective spheres of intrastate and interstate activities, a concept has been developed, relating to the movement of commodities between the states, which says that interstate activity ends when the commodities come to rest within the state. American Steel & Wire Co. v. Speed, 1904, 192 U.S. 500, 24 S.Ct. 365, 48 L.Ed. 538; Atlantic C. L. Ry. v. Standard Oil Co., 1927, 275 U.S. 257, 267, 48 S.Ct. 107, 72 L.Ed. 270; Chicago, Milwaukee & St. Paul Ry. v. Iowa, 1914, 233 U.S. 334, 343, 34 S.Ct. 592, 58 L.Ed. 988; Schechter Corp. v. United States, 1935, 295 U.S. 495, 543, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Federal Trade Commission v. Bunte Bros., 1941, 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881. And its widest application has been made in cases upholding the regulatory powers, especially the taxing power, of a state over goods in transit during their stay in the state. See, Southern Pacific Co. v. Gallagher, 1939, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586, and other cases cited above. But the courts have warned us not to accept the concession which the federal government is thus willing to make to state sovereignty in matters of this character in a dogmatic sense. Specifically have they warned us that these cases do not delimit the extent of federal control over interstate commerce. See Binderup v. Pathe Exchange, 1923, 263 U.S. 291, 311, 44 S.Ct. 96, 68 L.Ed. 308; Live Poultry Dealers' Protective Association v. United States, 2 Cir., 1924, 4 F.2d 840, 842.

■ So they have taken cognizance of the fact that many strictly local activities may injuriously affect interstate commerce or restrain it so as to come under the interdict of anti-trust legislation. Coronado Coal Co. v. United Mine Workers, 1925, 268 U.S. 295, 45 S.Ct. 551, 69 L.Ed. 963; United States v. Trenton Potteries Co., 1926, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989. "Activities conducted within state lines do not by this fact alone escape the sweep of the Commerce Clause." United States v. Rock Royal Co-Op., 1939, 307 U.S. 533, 569, 59 S.Ct. 993, 1011, 83 L.Ed. 1446.

■ Agreements stabilizing prices either at a maximum or a minimum or through a formula are illegal. See Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 1931, 47 F.2d 156; Local 167 v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Fashion Guild v. Federal Trade Commission, 1941, 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed. 949; United States v. General Motors Corp., 7 Cir., 1941, 121 F.2d 376, 377, 401, 402; and see my opinion in United States v. Heating, Piping & Air Conditioning Contractors Association, D.C.Cal. 1941, 33 F.Supp. 978.

■ In assaying price-fixing agreements, the test is not so much whether the effect is felt after the movement of the goods has reached the end of the interstate journey. The inquiry seeks the effect upon prices in the market. And if this effect be shown, it matters not that the movement has come to a halt within the state. The teaching of the most recent cases, to which I have just referred, and which I also discussed in the opinion on the motions to dismiss and to strike, is too clear to absolve price-fixing agreements solely because their effect may not be felt until local sales are made, in retail trade, at the end of the journey. To interpret them in this manner is not to destroy whatever distinction may exist between interstate and local activities. It is merely to recognize that the Supreme Court, realizing the inter-relation between local and interstate commerce, has declined to recognize a break in the continuity of movement of articles originating in interstate commerce, and has asserted the controlling power of the anti-trust law over the entire process. And so, when the

court says specifically that control of prices "in the state of destination where the interstate movement ends" (Local 167 v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L.Ed. 804) may come under the interdict of the anti-trust laws, we cannot assume that it was not aware of the full implication of the words.

The optative mood in the language of the court does not mean that in price-fixing other elements of restraint must be shown. If the language had that meaning, the teaching of the later case—that price-fixing alone is a violation—gives the contrary answer.

The bearing of this upon the facts before me is obvious.

There is undisputed evidence of price-fixing here. The best proof, perhaps, lies in the fact that counsel for the defendants have sought to eliminate a large volume of documents which clearly carry this import by referring to them as "the extra-curricular activities" of the three successive executive secretaries of the Food and Grocery Bureau of Southern California. We pick others from the large number of exhibits. Here is a card, dated January 3, 1937 (Exhibit 894), headed "Grocers Watch Your Prices. Make a Profit in 1938". On December 2, 1937 (Exhibit 1192), another warning, "Grocers Keep Your Prices in Line with Minimum Mark-up". On April 25, 1938 (Exhibit 861), this warning, "Grocers, Observe These Prices and Other Maximum Legal Prices". There is a striking similarity between these admonitions and the so-called "advisory" suggestions as to prices condemned in American Column Co. v. United States, 1921, 257 U.S. 377, 392, 42 S.Ct. 114, 66 L.Ed 284, 21 A.L.R. 1093, and in United States v. American Linseed Oil Co., 1923, 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035. Here, for instance, are sentences from the so-called "open" or "new Competition" plan involved in the former case, in the italicized portions of which the Court found clear indication of price-fixing commitments:

" 'The theoretical proposition at the basis of the Open Competition Plan is that

" '*Knowledge regarding prices actually made is all that is necessary to keep prices at reasonably stable and normal levels.*

" 'The Open Competition Plan is a central clearing house for information on prices, trade statistics and practices. By keeping all members fully and quickly informed of what the others have done, the work of the Plan results in a *certain uniformity of trade practice.* There is no agreement to follow the practice of others, *although members do follow their most intelligent competitors,* if they know what these competitors have been actually doing.
* * *

" 'The keynote to modern business success is mutual confidence and co-operation. *Co-operative competition, not cut-throat competition.* Co-operation is a matter of business because it pays, because it enables you to get the best price for your product, because you come into closer *personal contact with the market.*

" '*Co-operation will only replace undesirable competition* as you develop a co-operative spirit.' " American Column Co. v. United States, 1921, 257 U.S. 377, 392-394, 42 S.Ct. 114, 115, 66 L.Ed. 284, 21 A.L.R. 1093. (Italics are the court's.)

The butter and egg cards, of which hundreds are in the record, were not *informative letters* giving available information to guide the retailers. They were price lists, at which retail grocers were urged to sell. In the case of recalcitrants, there were appeals to the profit motive. The oleomargarine cards repeatedly warned against selling below a minimum price. Illustrative is Exhibit 311, which reads: "Grocers of Riverside and San Bernardino Counties: This office is advised many of you are selling Oleo margarine at 12 cents per pound and while we know that some few sales have been made at a cost that will permit this as a retail price, in justice to yourselves and other merchants, we are asking the entire trade to sell no brand of Oleomargarine at less than 12½ cents per pound. Kindly observe this price at once. Food and Grocery Bureau of Southern California, 1151 S. Broadway, Los Angeles Pr. 1041"

In one letter, Exhibit 199, a dealer is warned that, despite the fact that he may be in a position to sell butter below a minimum price, he should not do so because the arrangement "has made many thousands of dollars profit for the grocers". The entire paragraph is so revealing that it may be given here in full from the letter dated January 29, 1940: "As we stated to you in a recent communication, almost every market operator in this city

enjoys a cost on under-score butter which would enable him to undersell our card quotations on those grades which are based on the local market quotations as secured from the Produce Exchange, but we repeat that the mutual arrangement agreed upon some five years ago and which has been adhered to most religiously by the large majority of operators has made many thousands of dollars profit for the grocers; but if certain stores are going to arbitrarily use their own cost on out-of-state butter as a basis rather than our quotations, our price structure will quickly break down not only on the under-score grades but it will soon effect the better known advertised brands in this market and your entire profit on butter is threatened, and we will approach a condition prevalent before the Butter and Egg agreement was reached at which time both items were sold at a loss constantly by the retail trade." In the face of language of this character, it is sheer fiction to insist that the Bureau was only interested in preventing sales below cost.

The story is the same as to other articles, clearly originating in interstate commerce. We have a postal card dated December 17, 1936 (Exhibit 1385), relating to oleomargarine which reads:

"Grocers: Oleomargarine Dec. 17, 1936.

"This is to advise you that the Minimum Retail Price on competitive brands of Oleomargarine must be, on and after Monday, December 21, 1936, not less than 2 lbs for 27 cents. Prices below that amount must be stopped, and unless this is done voluntarily the necessary steps will be taken immediately to stop them."

A letter of December 29, 1936 (Exhibit 1386), reads:

"Beginning Monday, January 4, 1937, the minimum legal price on canned milk will be—unadv. brands, 4 tall cans 25 cents—adv. brands, 3 tall cans 19 cents.

"You are Requested to Discontinue Any Further Use of Prices Below These Amounts."

Repeatedly, prices are set and warning given not to undersell.

In the opinion on the motion to dismiss, I referred to Exhibit 402, in which the policy behind the activity—that of controlling prices—was laid down. Repeatedly, throughout the record, the so-called "Gentlemen's Agreement" to control prices,

of which this exhibit speaks, crops out. The effect of this activity is not important. The Anti-Trust Law is aimed at the agreement to restrain, not at its success or the amount of interstate commerce it may affect. Socony-Vacuum Oil Co. v. United States, 1941, 310 U.S. 150, 224, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Co. v. Leader, 1941, 310 U.S. 469, 485, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

The words of the Court in American Column Co. v. United States, 1921, 257 U.S. 377, 399, 42 S.Ct. 114, 116, 66 L.Ed. 284, 21 A.L.R. 1093, apply with great force: "It is plain that the only element lacking in this scheme to make it a familiar type of the competition suppressing organization is a definite agreement as to production and prices. But this is supplied: By the disposition of men 'to follow their most intelligent competitors,' especially when powerful; by the inherent disposition to make all the money possible, joined with the steady cultivation of the value of 'harmony' of action; and by the system of reports, which makes the discovery of price reductions inevitable and immediate. The sanctions of the plan obviously are financial interest, intimate personal conduct, and business honor, all operating under the restraint of exposure of what would be deemed bad faith and of trade punishment by powerful rivals."

So here, the Bureau, its President during practically the entire period, Ralph R. Brubaker, its two secretaries, who are defendants, Carl M. Grayson and Clarence A. Plumridge, its first secretary, W. H. Loughry, and the directors are directly responsible for these acts.

It is true that Brubaker sought to exculpate himself by pleading ignorance of the activities of the Bureau carried on through the secretaries. But, of his own volition, he has pleaded nolo contendere, and the Court has accepted the plea. Whatever may have been the misimpression in the past about this plea, it is now definitely settled by the Supreme Court (Hudson v. United States, 1926, 272 U.S. 451, 47 S.Ct. 127, 71 L.Ed. 347) that it is, in effect, a plea of guilty, warranting the imposition of the maximum punishment provided by law. Therefore, as a trier of facts, I prefer to take the full implications of culpability of Brubaker's plea rather than his attempted self-exculpation at the trial. The various de-

980

fendants who, at different times, have occupied positions on the Board of Directors, also protested their innocence. They stated that the object for which they associated themselves with the Bureau was to enforce the California Unfair Practices Act, Act 8781, Deering's General Laws of California, Calif.Stats.1935, p. 1546. I stated in the opinion on the motion to dismiss that no conspiracy can arise from the doing of a lawful act unless the means are unlawful. 15 C.J.S., Conspiracy, § 42, p. 1065; Marino v. United States, 9 Cir., 1937, 91 F.2d 691, 693, 694. I was speaking of conspiracy in general. And the principle which, at common law and in the absence of contrary statutory provision, governs the law of criminal conspiracy. But, just as the Congress of the United States may consider harmful and penalize an act which, to us as students of government, has no anti-social implications at all, so may it declare that certain acts, although legal when done by one person, should be illegal if done by several. It has done this in the anti-trust legislation. So if there be violation of this law, it matters not that the Bureau may have engaged in other very laudable activities. The Unfair Practices Act of California contains nothing which, in itself, is a violation of the anti-trust statute. It forbids certain practices. And had the Bureau limited itself to advising the Trade, from time to time, as to the manner of complying with it, had they been satisfied with issuing, from time to time, real surveys to guide persons in fixing their prices, there, probably, would have been no prosecution. But when, under the guise of enforcing the Act, clear price-fixing and price stabilization activities are carried on, the protestations of lawful motive lack force: "The lady doth protest too much, methinks." Hamlet, Act IV, Scene 2, Line 242.

The attempt of the directors to blame the various secretaries for the Bureau's incursion into illegal fields does not impress me. True, the services of the directors were gratuitous. It may well be that they thought they were rendering a public service. And if the acts of the Bureau had been sporadic, it might well be argued that they escaped the attention of the directors. But they were not of this character. They were persistent throughout the period of the conspiracy from 1935 to 1941. At one stage or another, during the incumbency of the various directors, there came to their attention, as the minutes and letters show, the fact that the Association was endeavoring to establish agreed prices. Each of them was a grocer. They all received, in due course, communications of the type I have described. They knew from their wording that these cards were not statistical data to guide them in fixing their prices. They talked, always about "prices" or "minimum prices" for the day or for the week. There were exhortations to hold them up, appeals to the profit motive, and injunctions against deviation from "the straight and narrow path" of the "Gentlemen's Agreement".

"It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators. United States v. Schenk, D.C., 253 F. 212, 213, affirmed 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Levey v. United States, 9 Cir., 92 F.2d 688, 691. Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." Interstate Circuit v. United States, 1939, 306 U.S. 208, 209, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610.

 The evidence, to my mind, establishes clearly that, despite their denials, the directors knew of the so-called "extra-curricular" activities of the secretaries and assented to them. This is enough to fasten culpability upon them. See, People v. Moore, 1927, 82 Cal.App. 739, 747, 748, 256 P. 266; People v. Armentrout, 1931, 118 Cal.App.Supp. 761, 772, 1 P.2d 556.

There is some evidence that on two or three occasions the "out-of-bounds" language of some of the cards and letters was discussed with the secretaries—especially Grayson. But there is no written evidence in the minutes of the Association of any repudiation by the directors. There are changes of wording in certain of the cards, some of which are strangely coincidental with the period of investigation which preceded this indictment. This means little. Even the statement of policy, prepared by the Bureau's counsel and given to Plumridge, after he succeeded Grayson as secretary (Exhibit J), strangely fails to condemn any of the practices which were inaugurated under the regime of Loughry, as

Executive Secretary, and continued by the second Executive Secretary, Grayson, under whom Plumridge trained before he succeeded him. Its entire tenor is to state merely that the Bureau, rather than use coercion against the individuals, should be satisfied with resorting to the coercive power of the courts.

In sum, there is no contemporaneous written memorial, prior to the return of this indictment, of any action on the part of the Bureau, acting through its officers or directors, condemning or repudiating the policy which they now forswear in court.

It follows that their guilt is established.

■■■ As to Count 1 of the indictment, the only defendants on trial are the Bureau and Grayson. It charges conspiracy to control wholesale prices. I do not think the evidence on this Count is sufficient. There are some documents which might be interpreted as showing that the Bureau aided wholesalers in furthering an agreement to fix wholesale prices. But this was not the chief concern or object of the Bureau. Whatever aid it may have rendered along this line was collateral to its main activities. Whatever they did was more by way of accomodation. They may have helped the wholesalers get together. But they were not parties to any agreement as to policy which may have resulted from the meetings. Nor did they participate in anything which the wholesalers did. Such participation should appear clearly before guilt is found.

■■■ There is, however, as appears from what I have said, ample evidence to show that each of the remaining defendants was guilty of the charge in the second count of the indictment—of conspiring to fix retail prices.

Hence the verdict:

I find the defendants Food and Grocery Bureau of Southern California, Inc., a corporation, and Carl M. Grayson, and each of them, not guilty as charged in Count I of the indictment.

I find the defendants Food and Grocery Bureau of Southern California, Inc., a corporation, Carl M. Grayson, S. M. White, Clarence A. Plumridge, Roy J. Porter, Clayton Whiteman, Myer Pransky, Sam Seelig, Henry J. Carty, T. I. Lingo, Harry R. Zenor, George Hagmann, Jr., and Miller Allen, and each of them, guilty as charged in Count II of the Indictment.