**FOOD AND GROCERY BUREAU OF SOUTHERN CALIFORNIA, Inc., et al. v. UNITED STATES.**

No. 10109.

Circuit Court of Appeals, Ninth Circuit.
Dec. 30, 1943.
Rehearing Denied Feb. 16, 1944.

974

Otto Christensen, J. Wesley Cupp, D. G. Montgomery, Mitchell, Johnson & Ludwick, and Byron C. Hanna, all of Los Angeles, Cal., for appellants.

Tom C. Clark, Asst. Atty. Gen., and James E. Harrington, Harold F. Collins, and Alfred C. Ackerson,, Sp. Assts. to Atty. Gen., all of Los Angeles, Cal., for appellee.

Moses Lasky, Brobeck, Phleger & Harrison, and E. R. Hoerchner, all of San Francisco, Cal., amicus curiae.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

The Food and Grocery Bureau, a corporation, hereinafter called the Bureau, and the persons composing its directorate, appeal from a judgment of the district court in a jury waived case convicting them of conspiring to restrain interstate commerce in fixing retail prices of food and groceries sold in the State of California but in large part brought into the state with the intent to sell them at the fixed prices, in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1.

Appellants contended below that there was no violation of the Sherman Act if all their activities were confined to making effective the California Unfair Practices Act.[1] With this the district court agreed, stating: "* * * The Unfair Practices Act of California contains nothing which, in itself, is a violation of the anti-trust statute. It forbids certain practices. And had the Bureau limited itself to advising the Trade, from time to time, as to the manner of complying with it, had they been satisfied with issuing, from time to time, real surveys to guide persons in fixing their prices, there, probably, would have been no prosecution. * * *." United States v. Food and Grocery Bureau of Southern California, D.C., 43 F.Supp. 974, 980.

The language of the rulings in the trial court show that the issue there tried was whether the appellants' price fixing activities were confined to acts making effective the Unfair Practices Act. The district court held they were not. With this we agree, and hence are not required to determine whether the enforcement of the California Unfair Practices Act would violate the Sherman Act.

Our analysis of the Unfair Practices Act shows that it does not propose to prohibit sales below the cost of the vendor. He may sell his merchandise at any price he pleases in the ordinary course of his business. It is only when his sales are accompanied by the intent to injure some competitor or to destroy competition or to divert trade from a competitor that he is penalized. This appears from Section 3, of which the pertinent portions are:

"§ 3. It shall be unlawful for any person engaged in business within this State, to sell any article or product at less than the cost thereof to such vendor, or give away any article or product, for the purpose of injuring competitors or destroying competition, and he shall also be guilty of a misdemeanor, and on conviction thereof shall be subject to the penalties set out in section 11 of this act for any such act. * * *

"The prohibition of this act shall be deemed among the other purposes and objects of the act to also prohibit the practice of using any article or product as a 'loss leader.' Loss leader, as used herein, shall mean any article or product sold at less than cost as herein defined to induce, promote or encourage, the purchase of other merchandise, or which may have the tendency or capacity to mislead or deceive purchasers or prospective purchasers, or which diverts trade from or otherwise injures competitors.".

It is obvious that a grocer overstocked with any commodity may sell it at less than cost with no intent other than to make the sale, and that such sale may not divert trade from or in any way injure any competitor or deceive any customer. Equally obvious that such sales instead of destroying competition may greatly stimulate it. It is only when there is the intent or effect prohibited by section 3 that the sale below cost is prohibited by the Unfair Practices Act.

The California supreme court holds that:

The Unfair Practices Act "*₀ * * In its true sense it is not a price fixing statute at all. It merely fixes a level below which the producer or distributor may not sell with intent to injure a competitor. In all other respects price is the result of untrammelled discretion. * * *

"* * * It must be borne in mind that this statute does not regulate the selling

---

[1] California Unfair Practices Act, Deering's General Laws, Act 8781.

*of commodities—it is the predatory trade practice of selling below cost with intent to injure competitors which the legislature on reasonable grounds has determined is vicious and unfair that is prohibited.* Such determination is clearly within the legislative power. The state may not have power to regulate all trade practices affecting competition, but it clearly has power to restrict or prohibit trade practices which upon reasonable grounds it determines are predatory, vicious, unfair and anti-social.

"It is next urged by appellant that every sale below cost, except as provided in section 6, is made unlawful by section 3 regardless of intent, and that so construed the act is unconstitutional. It would certainly add to the weight of appellant's argument on the main issue if the statute omitted intent as an integral part of the act prohibited. It is one thing, from a legal standpoint, to prohibit sales below cost engaged in for the purpose of injuring competitors and destroying competition, and quite another to merely prohibit all such sales regardless of intent. It may well be that an absolute prohibition regardless of intent would be unreasonable. See Fairmont Creamery Co. v. [State of] Minnesota, 274 U.S. 1, 47 S.Ct. 506, 71 L.Ed. 893, 52 A.L.R. 163. However, it is our opinion that section 3, properly interpreted, requires the designated intent before selling below cost is prohibited. * * *." (Emphasis supplied.)

Wholesale T. Dealers v. National, etc., Co., 11 Cal.2d 634, 655, 658, 82 P.2d 3, 118 A.L.R. 486.

█ We are in agreement with this determination by the California supreme court of the character of the California statute which is binding on us in any event. Louisiana Highway Commission v. Farnsworth, 5 Cir., 74 F.2d 910, 913, certiorari denied 294 U.S. 729, 55 S.Ct. 638, 79 L.Ed. 1259.

The Bureau served some thousands of Southern California retailers of food and groceries with frequent statements of minimum prices at which particular items of the trade should be sold. They claim that in this they were doing no more than performing the function contemplated by section 5 of the Act: "§ 5. * * * Where a particular trade or industry, of which the person, firm or corporation complained against is a member, has an established cost survey for the locality and vicinity in which the offense is committed, the said cost survey shall be deemed competent evidence to be used in proving the costs of the person, firm or corporation complained against within the provisions of this act. * * *." The evidence shows that from 1935 to well into 1937 there was no such cost survey as contemplated by the Act. For reasons later stated it is irrelevant whether any such survey subsequently was made. What was thereafter done with any such surveys was to use them to fix minimum prices and not merely to provide rebuttable "evidence" in a prosecution in which the offense was having an intent to injure a particular competitor in making a particular sale at the price below defendant's cost.

The Bureau also was actively engaged in investigating the prices of retailers, both members and others, and in putting pressure on them not to sell below the cost of price lists which it circulated. In this, appellants claim, they were doing no more than the policing of the California Act.

There is abundant evidence that for a period from 1935 to 1941 the corporation and its president and two executive secretaries conspired to compel the Bureau members and others to sell food and groceries at not less than minimum prices circulated by the Bureau, regardless of whether such sales were with an intent to injure a competitor or diverted trade from him. Every Bureau director-appellant here admitted below that he understood the purpose of the Bureau's activities was expressed in a letter of its secretary soliciting membership and stating that:

"The purpose of the organization is to continue the proven benefits of the Trade Practices Provisions of the Food Codes, including the 2% Wholesale and 6% Retail minimum markups *and to bring to an end the disastrous price war now raging here.*

*           *           *           *           *

"On and after July 1st, 1935, *there must be no sales made at less than cost,* plus 2% wholesale and 6% retail added for cost of doing business, and the Trade Practice Provisions prohibiting combination sales, premiums, giving way merchandise, etc. must be observed.

*           *           *           *           *

"Your signature indicating your desire to become a member and remittance for your share are earnestly requested by re-

turn mail. Sign and return one copy of the card with your remittance.

"Very truly yours,

"Food and Grocery Bureau of Southern California

"W. H. Loughry,

"Executive Sec'y."

(Emphasis supplied.)

In the scores of letters in the record, samples of many thousands sent out by the Bureau's secretaries to its members, we are unable to find one remotely suggesting that no such sale was illegal because below the cost determined under the formula of the statute unless with the seller's intent to injure or to take trade from a competitor. On such evidence alone the district court was entitled to draw the inference of an agreement to fix minimum prices in every case and not an agreement confined to enforce the Act whose sole object was the prevention of a specific injury by one competitor to another.

There was drastic action by the Bureau to carry out its declared purpose that "On and after July 1st, 1935, there must be no sales made at less than cost, plus 2% wholesale and 6% retail added for cost of doing business." The record shows that from 1935 until late in 1939 there were many such instructions by the Bureau to its members as "The minimum prices on sugar are: Fine granulated, 10# paper bag......51¢ [and on other grades] * *' * and I would ask you to immediately conform your prices in the future to the amounts quoted on this list * * *." Accompanying a price list on eggs and butter was the instruction "Grocers: Be Sure to Observe Not Less Than New Minimum Prices Released on Special Cards on Pineapple, Flour & Soap Powders," and on a price list on butter and eggs was the instruction "Grocers: Adhere Strictly to These Butter and Egg Prices."

It was within the Bureau's purpose so to stabilize prices and prevent price competition that the Bureau's executive secretaries extended their pressure and attempted control over the sales of all grocery products including such as were purchased and received in interstate commerce. A significant aspect of the conspiracy was the direct and intentional discrimination against, and restraint of, out-of-state grocery products which competed with local products. As an illustration, Insular Sugar Refining Company, which produced Snowflake brand cane sugar in the Philippines, offered it for sale in Southern California at prices which were not only below those asked for competitive domestic cane sugar, but also which enabled Snowflake sugar to compete with domestic beet sugar. Obviously, Insular resorted to this price policy in order to place its off-shore product on a competitive basis with the established brands of domestic cane sugar. The Bureau's acts in enforcing a uniform price for all cane sugar was intended to deprive Insular of any competitive advantage. This restraint was observed not only in the retail sales price of such sugar, but also in the jobber and wholesale prices as well. This vertical price control was necessary to insure the maintenance of the uniform retail price and also to preserve the profit motive and inducement of the conspiracy. It applied uniformly to the purchases and sales of the Bureau's retailers and others who engaged in interstate commerce as direct out-of-state buyers.

Another type of restraint practiced by the appellants and clearly portrayed in the record related to the control of out-of-state butter and eggs. Minutes of a Bureau directors' meeting held on February 10, 1939, and attended by individual appellants describe the activity as follows:

"The condition of the retail egg market was mentioned by the Secretary wherein in some cases the prices quoted on the butter and egg card were not adhered to both on eggs and butter owing to the claim on the part of some members of the trade that *outside* eggs were being brought in at prices much below those justified by local quotations. However, it was agreed by the Board members that the *quotations as given out by the Bureau office twice each week should be adhered* to at least until another meeting of the Board could be held to determine whether the unsettled condition of the egg market was to continue thereby making it inadvisable to endeavor to hold the prices to a level based on local produce Exchange quotation. * * *." (Emphasis supplied.)[2]

---

[2] Typical of the Bureau's pressure regarding price stabilizing of out-of-state butter sold in California is Plaintiff's Exhibit No. 6:

"January 29, 1940

"To: Retail Grocers

"According to prices on under-score butter appearing in your advertisements

There was a weekly import of over 30,-000 pounds of butter from Utah and Colorado into the Southern California marketing area. The cost of this butter delivered was 1½¢ to 2¢ a pound less than the local butter of the same quality. Yet, despite this difference in cost to the retailer, the Bureau fixed a flat price differential of 1¢ a pound only. Under no concept of the Unfair Practices Act could it be said that such requirement of adherence to quotations, despite lower cost of out-of-state merchandise, was authorized by the Act.

The record also portrays clearly the measures pursued by appellants to insure compliance with their distribution and price-fixing policies on the part of manufacturers and distributors. One of the early actions of the Bureau was to call a meeting to consider whether the members should make efforts to induce manufacturers of highly competitive items to place those items under so-called Fair Trade contracts or to issue so-called suggested retail prices so as to insure the retailer a "reasonable profit." At a meeting of the Bureau's directors, a committee was appointed to treat with manufacturers for this purpose. Subsequently, at a meeting held December 15, 1936, it appeared that the committee had taken no definite action on "pressing manufacturers" but at that time the Bureau's executive secretary (Grayson) was authorized to urge the grocery trade to press manufacturers for this purpose and to cooperate with the Southern California Retail Grocers Association in its more extensive efforts along the same line. Southern California Retail Grocers Association publishes "Grocers Journal" which it distributes to 3100 or more grocers. Approximately 1050 retail grocers are affiliated with this organization and the appellant Sam White has been its secretary and manager for 10 years; White became a director of the Bureau in 1938 as a representative of this large group of grocers.

Illustrative of the pressure technique employed by appellants upon manufacturers is a series of letters which they caused the Bureau to send to several soap manufacturers, including such out-of-state manufacturers and national distributors as Lever Bros., Proctor & Gamble Co., Colgate Palmolive Peet Co. and Swift & Co., the purpose of which was to compel soap manufacturers to cease selling certain types of their products to a certain chain store organization. The soap manufacturers were urged "to cut out the monkey business" and settle on a price "that this office [appellant Bureau] can use as a basis to control the retail price."

recently you are still not conforming as per our request to the prices listed on the Butter and Egg cards released from this office on each Monday and Thursday evening for the future corresponding advertising periods.

"As we stated to you in a recent communication, almost every market operator in this city enjoys a cost on under-score butter which would enable him to under-sell our card quotations on those grades which are based on the local market quotations as secured from the Produce Exchange, but we repeat that the mutual arrangement agreed upon some five years ago and which has been adhered to most religiously by the large majority of operators has made many thousands of dollars profit for the grocers; but if certain stores are going to arbitrarily use their own cost on out-of-state butter as a basis rather than our quotations, our price structure will quickly break down not only on the under-score grades but it will soon affect the better known advertised brands in this market and *your entire profit on butter is threatened*, and we will approach a condition prevalent before the Butter and Egg agreement was reached at which time both items were sold at a loss constantly by the retail trade.

"If you insist on maintaining your price based on your own cost, we will be compelled in this office to allow the entire trade to meet the lowest legal price known in the market, but to avoid this situation returning again, we implore you to adhere strictly to the card quotations.

"We have succeeded in our efforts to right this tendency to deviate from our set schedule in the past two weeks in causing some of the worst past offenders to now comply implicitly with the card prices and we urge you to lend your support to our endeavor to again stop these infractions and will expect your next advertisement to quote prices exactly as quoted on the cards which you receive.

"Very truly yours,
"Food and Grocery Bureau
of Southern California, Inc.
"Carl My Grayson
"Executive Secretary."
(Emphasis supplied.)

Here is served the profit motive of the entire trade, not the protection of a particular retailer against injury from another.

978

At the meeting held November 28, 1938, the Bureau's board of directors adopted and sent to Coffee Products of America, Ltd., a resolution condemning that company's sales promotion plan which entailed the offer of its Ben Hur brand coffee at 22¢ a pound, the complaint being that this price did not allow "the retailer to make the full 8% profit."

The Supreme Court in Local No. 167 v. United States, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L.Ed. 804, states that the control of prices "in the state of destination where the interstate movement ends may operate directly to restrain and monopolize interstate commerce."

 The cases cited by the district judge in one of his rulings sustain his holding that agreements stabilizing such prices either at a maximum or a minimum or through a formula violate the Sherman Act. Greater New York Live Poultry Chamber of Commerce v. United States, 2 Cir., 1931, 47 F.2d 156; Local No. 167 v. United States, 1934, 291 U.S. 293, 297, 54 S.Ct. 396, 78 L.Ed. 804; Ethyl Gasoline Corporation v. United States, 1940, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; Fashion Originators' Guild v. Trade Commission, 1941, 312 U.S. 457, 468, 668, 61 S.Ct. 703, 85 L.Ed. 949; United States v. General Motors Corporation, 7 Cir., 1941, 121 F.2d 376, 377.

Appellants contend that, assuming their acts so restrained interstate commerce, they did no more than to seek to enforce the provisions of section 3 of the Robinson-Patman Act, Sec. 13a Title 15 U.S.C.A. It provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser, in that, any discount, rebate, allowance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or advertising service charge available at the time of such transaction to said competitors in respect of a sale of goods of like grade, quality and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those exacted by said person elsewhere in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor." (Emphasis supplied.)

The italicized words show that, similar to the California Unfair Practices Act, the Robinson-Patman Act makes illegal the price competition of the kind protected by the Sherman Act only where it "discriminates to his [a competitor's] knowledge against competitors" or is "for the purpose of destroying competition or eliminating a competitor." No such limitation appears in the price stabilizing activities of the appellants.

 The district court's judgments of conviction are fully sustained by the evidence, all of which we deem properly admitted, and are affirmed.

Affirmed.