**FORD WHOLESALE COMPANY INC. OF SAN JOSE, a corporation, Plaintiff,**

**v.**

**FIBREBOARD PAPER PRODUCTS CORPORATION et al., Defendants.**

**No. 45977.**

United States District Court, N. D. California.

May 15, 1972.

Max M. Blecher, Blecher & Collins, Los Angeles, Cal., for plaintiff.

Brobeck, Phleger & Harrison, E. Judge Elderkin, San Francisco, Cal., for defendants.

MEMORANDUM OF DECISION ON DEFENDANTS' MOTION FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT INSOFAR AS SAID MOTIONS INVOLVE THE ISSUE OF INTERSTATE COMMERCE

SWEIGERT, District Judge.

Plaintiff contends (Brief of 12/13/71, pp. 32–33) that, since defendant failed to note interstate commerce in its pretrial statement as one of the issues in dispute, defendant is estopped to dispute plaintiff's allegation of interstate commerce.

Both parties filed pretrial statements herein, plaintiff on February 18, 1970 and defendant on April 6, 1970 and thereafter presented a proposed pretrial order based on their pretrial statements, approved by both parties as to form and approved by the court on November 4, 1970.

Neither plaintiff nor defendants adequately complied with Local Rule 105(a) (3), (4) which requires a plain, concise statement of undisputed facts and of each issue of fact which a party claims or concedes to be in dispute. Neither plaintiff nor defendants clearly indicated either in their respective pretrial statements or in the approved pretrial order whether interstate commerce was or was not a disputed issue in the case. (See Pre-Trial Order Par. 3(a) (h), "Undisputed Facts," Par. 4(A–B) "Disputed Facts" and Par. (11) "Stipulations").

Certainly, there is nothing in the record to justify plaintiff's contention that any deficiency of evidence to

support his interstate commerce allegation is due to plaintiff having been misled concerning the existence of the issue. There is no more reason to hold defendants estopped from raising the issue than there is reason to hold plaintiff estopped from avoiding the issue.

During a session with the trial judge concerning jury instructions, defendants' counsel took the position that the commerce question presented a straight law question for the court as to whether plaintiff had offered evidence sufficient to justify a jury finding that interstate commerce was involved. Defendant, who had submitted no instructions on the subject contended that no sufficient evidence had been offered and that there was, therefore, no commerce issue for the jury and that the issue should be withdrawn from the jury and ruled upon by the court.

Thereupon, counsel for plaintiff, although contending that there was sufficient evidence of interstate commerce, joined in defendants' suggestion that the interstate commerce issue be left for ruling by the court and withdrew its instructions on the subject of interstate commerce.

We proceed, therefore, upon what we regard as, in effect, a stipulation of the parties that the court, not the jury, should make the ruling upon the interstate commerce issue in this case.

Clearly, plaintiff concedes his understanding that the court was to decide the issue whether there was sufficient evidence to justify a jury finding that interstate commerce was involved. (Pltf's Brief, 12/13/71 p. 25).

## PLAINTIFF'S THEORY RE INTERSTATE COMMERCE

Plaintiff Ford was engaged in the business of distributing roofing products only in the California Counties of Santa Clara, Alameda, San Francisco, Contra Costa, Monterey and San Mateo. (Pretrial Order of December 7, 1970).

Defendant Fibreboard manufactured Pabco roofing products at the California cities of Martinez, Redwood City, Emeryville, Wilmington. It also had a plant in Portland, Oregon. (Pretrial Order of December 7, 1970). (Undisputed facts).

During the years from about 1961 until October 29, 1963, when Fibreboard terminated Ford (as of 12/31/63) as one of its distributors, Ford had regularly purchased from Fibreboard, under a merchandising policy statement (Pltf's Ex. 2), certain Pabco Asphalt Roofing Products at Fibreboard's Martinez, Contra Costa County plant, where the products were manufactured. Ford then retailed them to its customers within the six San Francisco Bay Area counties.

Since these Pabco Asphalt Roofing Products had been manufactured by Fibreboard, not outside of California, but right in Fibreboard's Martinez plant and had been there sold to Ford for redistribution wholly in local commerce, these intrastate transactions would not support interstate commerce jurisdiction in this case—unless plaintiff could show that the transactions, although wholly intrastate, did in some way substantially affect interstate commerce.

Plaintiff, however, makes no such contention in this case nor is there any evidence that these intrastate transactions actually affected interstate commerce substantially or otherwise.

Plaintiff, therefore, has staked his jurisdictional interstate commerce claim in this case upon some evidence in the record to the effect that, apart from the Pabco Asphalt Roofing Products manufactured at Martinez and sold *intrastate* to Ford, Fibreboard had some other items on hand at its Martinez plant which had come from out of state and which, plaintiff claims, were such as to bring Fibreboard's termination of the parties' otherwise intrastate transactions and relationships so "within the flow" of interstate commerce as to indicate substantial effect on interstate commerce *as a matter of law* without need for plaintiff to show any actual effect, substantial or otherwise, on interstate commerce. (See, Las Vegas Merchant Plumbers Assn. v. United States, infra)

We agree with plaintiff that Las Vegas Merchant Plumbers Assn. v. United States, 210 F.2d 732 (9th Cir. 1954) has well established the law to the effect that "A case under the antitrust laws, so far as the interstate commerce element is concerned may rest on one or both of two theories: (1) That the acts complained of occurred *within the flow* of interstate commerce. This is generally referred to as the 'in commerce' theory. (2) That the acts complained of, occurred wholly on the state or local level, in *intrastate* commerce, but substantially affected interstate commerce. Under both of these theories, the transactions complained of must affect or have an effect on interstate commerce or the requirements of the statute are not satisfied."

It is also true that *Las Vegas* Merchant Plumbers Assn., at pp. 748, 749, holds that, where the restraint complained of does occur "within the flow" of interstate commerce, then the test is qualitative, rather than quantitative, and there need be no evidentiary showing of a substantial effect of the restraint upon interstate commerce (as would be necessary under (2), i. e., the quantitative test) since in such case, i. e., as to violations per se occurring in the stream of interstate commerce, "the proscribed and substantial effect of these illegal acts followed as a matter of law." [1]

1. It will be noted, however, that the *Las Vegas Merchant Plumbers Assn.* case reached this conclusion in a context involving alleged price fixing—a per se antitrust violation.

The question arises whether the same presumption of law would follow in a case where the evidence would support, not a per se antitrust violation, but, at best, a violation based upon the test of the unreasonableness of the restraint.

The court in *Las Vegas Merchant Plumbers Assn.* (pp. 748, 749) indicated that this presumption is limited to cases where the restraint complained of, not only occurs within the flow of interstate commerce, but is also a per se type of restraint.

In Yellow Cab Company of Nevada v. Cab Employers, Automotive & Warehousemen, Local # 881, 457 F.2d 1032 (Ninth Circuit, 1972), our Ninth Circuit again recently recognized this limitation when it referred to "the well-settled rule that, where the activities are interstate in nature, a per se violation of the Sherman Act presumes, as a matter of law, an effect upon interstate commerce, thus negating a showing of the amount of commerce involved."

This same limitation is also noted in United States v. Bensinger Co., 430 F.2d 584 (8th Cir. 1970) (recently cited but factually distinguished in Yellow Cab Company v. Cab Employers, etc., supra. In *Bensinger* the court held the law to be that, even where the alleged conspiracy occurs within the flow of commerce, the interstate commerce issue further depends upon whether the restraint was a per se antitrust violation, e. g., price fixing, which requires no further showing of the reasonableness of the effect on interstate commerce or whether it was the kind of conspiracy which is subject only to the test of "reasonableness." If the former, said the court, then, of course, there would be no need to show that the effect on interstate commerce was direct and substantial because that would follow as a matter of law. Where however, the conspiracy, although occurring within the flow of commerce, is of a kind which is subject to the test of reasonableness, then, of course, that test must be met and it must be shown that the restraint in question was under all the circumstances an "unreasonable" restraint upon interstate commerce.

Although, at plaintiff's request, we instructed the jury upon a per se theory of the case as well as upon a reasonableness theory, we are convinced that there is no substantial evidence to support a per se restraint within the meaning of Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969) and that at best the evidence in this case would support only a restraint found to be "unreasonable" under the circumstances.

If these cases correctly state the law, we would have to conclude that, even assuming the restraint to have occurred "within the flow of interstate commerce," still, since there was no *per se* violation, plaintiff could not claim the presumption of law that the restraint substantially affected interstate commerce.

For reasons apparent in our memorandum, it is not necessary to rest our ruling upon a resolution of that question.

■ It is true that, if a restraint occurs within the "flow" of interstate commerce, substantial effect on interstate commerce then follows as a matter of law and there is no need to show that any particular amount of interstate commerce was affected by the restraint.

The question here, however, is whether there was any such "flow" or stream of interstate commerce. Certainly, there should be some substantial evidence to establish the premise that there was in fact a "flow" of *interstate* commerce that was interrupted by the restraint.

## THE EVIDENCE RE PLAINTIFF'S INTERSTATE COMMERCE THEORY

The other items relied upon by plaintiff to show a "flow" of *interstate* commerce as a premise for a *presumption of law* that such commerce was substantially affected are in effect as follows:

(1) Some "insulation material" manufactured, not by Fibreboard, but by others (Kaiser and Simpson) in Oregon and Washington, bought there by Fibreboard and brought to its Martinez plant at unspecified times and in unspecified amounts. This was not a Pabco product and there is no evidence that it was among the kind of products listed in the Fibreboard distribution policy statement (Ex. 2) or covered by the termination notice. Nor is there any evidence that this insulation material was brought to Martinez with any degree of regularity. There is some evidence that Ford (in addition to purchasing this insulation material directly from its manufacturer) had on occasion purchased some from Fibreboard's Martinez plant but there is no evidence as to when or in what amount. There is, on the other hand, evidence that, after Fibreboard's termination of Ford as one of its wholesale distributors, Ford continued to obtain this insulation material—either from its manufacturer or from other dealers—in the same manner as before the termination.

(2) Some other items, generally described as "specialty roofing materials" which had been made in Fibreboard's Portland, Oregon plant and on occasion brought to Martinez at unspecified times and in unspecified amounts (apparently when there had been a temporary shortage of material at the Martinez plant during its start-up period). There is no evidence as to the nature of these items (i. e., whether they were Pabco Asphalt Roofing materials or any of the four products listed in Fibreboard's statement of its merchandising arrangements with plaintiff Ford and its other distributors. (Pltf's Ex. 2). Nor is there any evidence that any such transfers were regularly made. Even more importantly, there is no evidence that Ford had ever ordered or purchased any of these particular items from Fibreboard.

■ Plaintiff Ford contends, however, that upon this evidence, it could be found that Fibreboard's refusal to continue Ford as a distributor of its Pabco Asphalt Roofing Products, manufactured in the Martinez plant, became a transaction occurring "in the flow" of interstate commerce, in that Fibreboard's termination precluded Ford "from purchasing from Fibreboard products made in Washington and Oregon. . . ." (Pltf's Brief of 12/13/71 at p. 30).

As to (1) supra, i. e., the "insulation material" brought by Fibreboard from Oregon and Washington, it is difficult to understand from the evidence above summarized how plaintiff can seriously contend it was precluded by the termination of its distributorship from obtaining such insulation material when that material was not even a subject of the distributorship or the termination thereof.

This evidence, as thin as we have ever seen on an interstate commerce issue, falls far short of supporting a finding that defendants' termination of the parties' otherwise intrastate transactions and relationship occurred "within the flow" of interstate commerce.

As to (2) supra, some so-called "specialty" items brought from Fibreboard's Portland plant to its Martinez plant on

some occasion, it is difficult to understand from the evidence above summarized how plaintiff can contend that it was precluded by the termination from obtaining those items—when there is no evidence that it ever did either order or receive any of them.

Here again, we conclude that this evidence is so thin as to fall far short of supporting a finding that defendants' termination of the otherwise intrastate transactions and relationship of the parties occurred "within the flow" of interstate commerce.

Upon the record in this case there is no substantial evidence that the termination significantly interrupted Ford's ability to obtain roofing material *except* the Pabco Asphalt Roofing Products manufactured at Martinez which it had been theretofore regularly receiving in an *intrastate* relationship under the terms of its Pabco distributorship arrangement.

■ There is no substantial evidence of any significant interference with any roofing materials which could be fairly said to have been "in the flow" of interstate commerce.[2]

Even assuming there was a per se violation in this case and further assuming that the Oregon and Washington items were such that ordinarily they could be held to have remained within the flow of interstate commerce, the evidence in this particular case is so meagre as to be insufficient to support any finding other than these items were (as in the recent case of Yellow Cab Company v. Cab Employers, supra n. 1) so "miniscule" as

---

2. It is not necessary to rest our ruling on a determination of a further question, raised by defendants, i. e., whether the out-of-state items brought to Martinez had ceased to be in interstate commerce when they "came to rest" in Fibreboard's Martinez plant.

Plaintiff, relying mainly on such cases as Binderup v. Pathe Exchange, Inc., 263 U.S. 291 at 309–311, 44 S.Ct. 96, 68 L.Ed. 308 (1923) and Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943) contends that these two items from Oregon and Washington could be considered to have remained in the flow of interstate commerce. The court in Lo Cicero v. Humble Oil & Refining Company, 319 F.Supp. 1133, 1137 (E.D.La.1970), after consideration of Walling v. Jacksonville Paper Co., supra; Mitchell v. Livingston & Thebaut Oil Company, 256 F.2d 757 (5th Cir. 1958); Allesandro v. C. F. Smith Co., 136 F.2d 75 (6th Cir. 1943), summarizes the rules as follows:

Generally, under "flow of commerce" principles, goods shipped into a state are considered to remain within the flow under three circumstances: where they are purchased by the wholesaler or retailer upon the order of a customer with the definite intention that the goods are to go at once to the customer; where the goods are purchased by the wholesaler or retailer from the supplier to meet the needs of specified customers pursuant to some understanding with the customer although not for immediate delivery; and where the goods are purchased by the wholesaler or retailer based on anticipated needs of specific customers, rather than upon prior orders or contracts. In *Lo Cicero*, the court adds that the test is whether the warehouseman acts as an independent businessman or as an agent of the manufacturer, citing Mitchell v. Livingston & Thebaut Oil Company, 256 F.2d 757 (5th Cir. 1958), and on the nature of his customer, citing Walker Oil Co. v. Hudson Oil Co. of Missouri, 414 F.2d 588 (5th Cir. 1969), also a Robinson-Patman Act case.

Applying these tests to our present case, there is no evidence in the record that any of the items from Oregon and Washington were stored in Fibreboard's Martinez warehouse pursuant to any arrangement falling within the first two categories above set forth.

As to those items the best that could be contended is that they fell within the last category, i. e., they were brought to Martinez by Fibreboard, acting as a wholesaler, to serve the anticipated needs of specific customers—although not upon prior orders or contracts.

However, since neither the "insulation" material nor the "other" roofing material from Portland have been shown to be items covered by the Fibreboard Distribution Policy Statement, or to have been significantly requested or purchased by any specific distributor, including Ford, there is insufficient basis for holding that they were brought to Martinez "to serve the anticipated needs of specific customers."

to make it readily apparent that any combination here involved was directed, not at any interstate activity, but at intrastate activity.

In Yellow Cab Company v. Cab Employers, supra n. 1, where, as in the pending case, the interstate commerce issue depended upon the "in flow" theory, the Court said: "Given the miniscule amount of business generated by Yellow Cab's interstate activity, it is readily apparent that intrastate business was the subject of the conspiracy." The Court also said: "Although it is true that the courts have held that a small amount of interstate commerce is sufficient to obtain federal jurisdiction, they have done so when the nature of the conspiracy has been directed against interstate commerce," distinguishing in this respect such cases as United States v. Bensinger Co., supra n. 1; United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), and Las Vegas Merchant Plumbers Assn. v. United States, supra, and noting that in the case before it the alleged conspiracy "was not directly aimed at the portion of plaintiff's business which involved interstate commerce" but at its "intrastate" activity and also adding the classic test of Page v. Work, 290 F.2d 323, 330 (9th Cir. 1961) that "the test of jurisdiction is not that acts complained of affect a business in interstate commerce but that the conduct complained of affects the interstate commerce of such business." The Court concluded that there was "no merit in the 'in commerce' theory propounded by Yellow Cab."

All that really appears in this case is plaintiff's claim that it has been somehow precluded from purchasing some items of unspecified nature and unspecified amount (and, therefore, presumably a minimal amount) occasionally brought from Portland to Martinez but—so far as the evidence shows—never even purchased by Ford.

It would be straining, indeed, to hold that a bare possibility that Ford might at some time acquire one or more of such items would transform an otherwise purely *intra*state relationship into an interrupted "flow" of interstate commerce.

There is no violation of the antitrust statute where the restraint on interstate commerce is non-existent or so insignificant as to call for application of the de minimis rule. 58 C.J.S. Monopolies § 22 n. 31, citing San Francisco Industrial Assn. v. United States, 268 U.S. 64, 83, 45 S.Ct. 403, 69 L.Ed. 849 (1925), where the Supreme Court considered a situation "so insignificant as to call for application of the maxim de minimis non curat lex," adding, "To extend a statute intended to reach and suppress real interference with the free flow of commerce among the several states to a situation so equivocal and lacking in substance would be to cast doubt upon the serious purpose with which it was framed."

This has been recognized by our Ninth Circuit in Yellow Cab Company v. Cab Employers, supra n. 1, where the court accepted appellee's contention that "the district court did not err when it deemed Yellow Cab's interstate business to be de minimis to its intrastate activity."

For the foregoing reasons the court has reached the conclusion that the evidence on the interstate issue is wholly insufficient, or at least so insubstantial and lacking in probative value, that there is no evidence whatsoever from which the jury might rationally have concluded that defendants restrained interstate commerce; that defendants' motion for judgment in defendants' favor notwithstanding the verdict, should for that reason be, and is, hereby granted with the alternative provision that, in the event such order should for any reason be set aside or reversed on appeal, the order (hereby made) for a new trial on the interstate commerce issue, unless also set aside or reversed on appeal, shall remain in effect. (See Rule 50(c), F.R. Civ.P., and Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246 (9th Cir. 1957).

Otherwise defendants' motions for judgment notwithstanding the verdict and/or for new trial are denied.