3. Defendants, in light of *Giordano*, question the authenticity of the signatures of the various Department of Justice officials who authored the letters of appointment. A pre-

John EVANS, Trustee in Bankruptcy for Hempfield Stores, Inc., a Bankrupt, Plaintiff,

v.

S. S. KRESGE COMPANY, a Foreign Corporation, Defendant.

Civ. A. No. 71–85.

United States District Court, W. D. Pennsylvania.

May 13, 1975.

sumption of regularity attaches to these letters, and they are authorized to be filed in the Clerk's office for this District, May v. United States, 236 F. 495 (8th Cir. 1915).

David R. Brown, Roslyn M. Litman, Pittsburgh, Pa., for plaintiff.

Andrew L. Weil, Pittsburgh, Pa., Henry T. Reath, Philadelphia, Pa., for defendant.

## OPINION and ORDER

McCUNE, District Judge.

Plaintiff, trustee in bankruptcy for Hempfield Stores, Inc., formerly Skat-Zap, Inc. (Hempfield) initiated this antitrust action in 1971 complaining that defendant, S. S. Kresge Company (Kresge), violated Section 1 of the Sherman Act, 15 U.S.C.A. § 1 which provides, *inter alia*, that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . among the several States, . . . is declared to be illegal." Plaintiff claims injury and seeks damages under § 4 of the Clayton Act, 15 U.S.C.A. § 15.

Following prolonged and extensive discovery [1] defendant has renewed its motion for summary judgment.[2] In

---

1. Jurisdiction has been in dispute since defendant's answer was filed. Much of the voluminous discovery proceedings has been concerned with the issue of subject matter jurisdiction raised by defendant's answer and prior motion for summary judgment.

2. Defendant's prior motion for summary judgment was denied by Opinion and Order of March 14, 1972.

support of that motion, defendant advances three arguments: (1) that the court does not have jurisdiction over the subject matter of this action; (2) that the conduct complained of is neither per se violative of § 1 of the Sherman Act nor unreasonable when examined by the "rule of reason" standard; and (3) that Hempfield's participation in the conduct complained of precludes any recovery by its trustee in bankruptcy as a matter of law.

Plaintiff has filed a cross motion for partial summary judgment in which it asks the court to determine that certain of the practices complained of are violative of § 1 as a matter of law (per se violations). Plaintiff's brief in opposition to defendant's motion for summary judgment addresses each of the alternative arguments advanced by defendant in support of its motion. First, plaintiff contends that the jurisdiction of the court over the subject matter of this complaint has been established. In the alternative, plaintiff contends that the jurisdictional issue is inextricably intertwined with determination of the merits thereby precluding entry of summary judgment. Plaintiff also argues that the issue of subject matter jurisdiction must be determined by the trier of fact, a jury in this case, since defendant has demanded a jury trial. Second, as we have already mentioned, plaintiff claims that the activities complained of are per se violative of § 1 of the Sherman Act. Finally, plaintiff denies that Hempfield's participation in the alleged price-fixing scheme and various other alleged restraints is a bar to its recovery.

Also before the court are a counterclaim by defendant seeking monies allegedly owed to it for unpaid rent and other itemized expenses and plaintiff's counterclaim in which plaintiff alleges that rent already paid for two months constitutes a preference under § 60 of the Bankruptcy Act, 11 U.S.C.A. § 96.

The court has heard oral argument on the respective motions for summary judgment and has considered the briefs of both parties.

We turn now to the facts which give rise to the present controversy.

### Facts

Defendant Kresge is incorporated under the laws of Michigan. It operates department stores in 48 states, the District of Columbia and several foreign countries. Some of those stores use the Kresge name while others operate under the name "K-Mart" which is defendant's registered exclusive service trade name.

Defendant has used the "K-Mart" trade name in an effort to develop a reputation as a low mark-up, highly competitive merchandiser selling quality merchandise at discount prices. From its inception the plan was designed and its success was dependent on high volume sales with a low per item profit margin. Kresge felt that the best way to achieve high volume sales was to draw on the potential buying power of those who made frequent food purchases. However, since Kresge had no prior experience in food merchandising and did not have any source of distribution, it elected to license its registered trade name to independent food store operators who would conduct a K-Mart Food Store operation as part of or adjacent to a K-Mart department store. This arrangement, it was felt, would provide "one-stop shopping" and enhance customer acceptance of the K-Mart program. This action is a direct result of two such license agreements entered into between Hempfield (Skat-Zap) and Kresge.

Prior to August 12, 1963, two of the incorporators of Hempfield, Frank Zapalla, Jr., and Frank Nascone were the owners of a real estate development firm known as Maret Corporation which solicited and obtained long term lease commitments from Kresge for department stores in two shopping centers, one located in Westmoreland County, the other in Allegheny County. However, the commitments were contingent upon Kresge's ability to obtain a licensee who

would operate a grocery store at each location. Hempfield was incorporated to operate the grocery stores.

Hempfield was incorporated on August 12, 1963, under the name of Skat-Zap, Inc. The incorporators and initial shareholders were Zapalla, Nascone, and Herman Skatell. Shortly thereafter on September 23, 1963, Hempfield and Kresge entered into a license agreement which authorized Hempfield to use the name "K-Mart Foods" for a period of twelve years at a retail supermarket located next door to the Kresge department store in the Westmoreland County shopping center. The store was designated K-Mart Food Store No. 4032. Approximately eight months later, the same parties concluded a second agreement which authorized Hempfield's use of the name "K-Mart" for a ten-year period at a store located in the Allegheny County shopping center. Kresge designated this K-Mart Food Store No. 4064.

Pursuant to these agreements, Hempfield opened Food Stores 4032 and 4064 in 1964 and continued to operate both until July, 1969, at which time the leases were terminated. Shortly thereafter, Hempfield filed a petition in bankruptcy.[3]

During the years of its operation Hempfield went through a succession of ownerships. In 1967, a joint venture entity of, which Gerald Loevner was the partner-in-charge assumed control of all outstanding shares until January, 1969, when Anthony Polito, who had been associated with the supermarkets in various capacities since 1965, purchased all Hempfield stock.

While the grocery supermarket and the department store at each K-Mart location were designed to appear to the public as a single entity providing "one-stop shopping," in fact, the stores were independently operated. None of the goods sold by Hempfield was permitted to carry the K-Mart or any other Kresge brand name. Nor was Hempfield permitted to use the name "K-Mart" on its checks, its business stationery or even its pricing labels. Neither sold any goods or services to the other and Kresge did not dictate Hempfield's source of supply.

The record reveals the major supplier of Hempfield's groceries was a Pennsylvania wholesaler, Fox Grocery Company, a large local grocery outlet, which was located in the area of both Hempfield stores. Plaintiff alleges that it also received a substantial quantity of goods via direct shipment from out of state suppliers which amounted to in excess of $400,000.00 per year at cost. However, it appears that the bankrupt's records are incomplete in many respects. The parties have been unable to determine exactly what volume of purchases Hempfield made from out of state sources, from whom such purchases were made and whether the goods were actually shipped in from out of state or merely billed from out of state addresses.

It appears that the total retail volume of both Hempfield stores was in the vicinity of four million dollars per year,[4] almost all of which came from the sale of groceries although both stores sold the usual non-food items customarily

---

3. See Civil Action No. 69–271, Western District of Pennsylvania, filed August 29, 1969. It also appears that a receiver was appointed by the Court of Common Pleas of Allegheny County at No. 3432, July Term, 1969, in a state dissolution proceedings.

4. The annual gross sales of both Hempfield stores were approximately as follows:

| Year | Gross Sales |
|------|-------------|
| 1964 | $2,967,796.00 |
| 1965 | 4,620,727.00 |
| 1966 | 4,050,416.00 |
| 1967 | 4,183,012.00 |
| 1968 | 4,369,971.00 |

See Supplemental Affidavit of Anthony C. Polito.

found in grocery stores, e. g., health and beauty aids.[5]

It is undisputed that Hempfield's sales all occurred in the communities where its two stores were located.

The essence of the complaint is that defendant, through various provisions of the license agreements and the rules and regulations which supplemented those agreements, unlawfully sought to regulate certain aspects of Hempfield's business in violation of Section 1 of the Sherman Act. It is not necessary to set forth the various provisions of the license agreements in detail. In substance, they required, *inter alia,* that Hempfield (1) charge prices identical to those charged by Kresge on "like items," i. e., items sold by both the food stores and the department stores which prices were established by defendant in the event the parties were unable to arrive at a mutually agreeable price; maintain merchandise "competitive"[6] in price with the same or similar goods offered for sale in the trading area; (3) limit non-food merchandise offered for sale to specific categories of goods; (4) refrain from entering into fair trade agreements; (5) refrain from issuing trading stamps without express permission from Kresge; and (6) use certain equipment furnished by defendant at Food Store 4064 (Count II).

Plaintiff alleges that the above listed restraints "contributed to Hempfield's business failure." In plaintiff's view, the first of the above mentioned restraints resulted in a horizontal price-fixing arrangement which is a per se violation of § 1; alleged restraints 2 through 5 interfered with Hempfield's ability to exercise its independent business judgment; and alleged restraint 6 was an unlawful tying agreement.

Defendant denies that any or all of the practices complained of violated the Sherman Act. Furthermore, it denies that any of the alleged restraints contributed to Hempfield's business failure which it attributes to bad management, insufficient capitalization and excessive debt structure.

From time to time, Kresge sent employees to inspect both stores for compliance with the terms of the license agreements and the rules and regulations. Plaintiff refers to these periodic check-ups as "policing" since, if violations of the license agreements were found to exist, defendant, in effect, issued citations. It appears that as a result of such inspections, Hempfield was directed on several occasions to remove certain unauthorized merchandise or to discontinue its sale when the stock on hand was exhausted.[7] The record also indicates that comparative price checks were made on grocery items to see if they were competitive with other supermarkets in the area.[8] Defendant also prepared and issued Identical Pricing

---

5. For a complete list of the categories of merchandise sold by both the Hempfield stores and the Kresge department stores, see Defendant's Interrogatories to Plaintiff (First Set), question 7.

6. Plaintiff contends that, as interpreted by defendant, being "competitive" in price meant meeting the lowest price of all its competitors on each and every item which Hempfield sold. As explained by counsel for plaintiff at oral argument: Assume Hempfield has three competitors—A, B, and C in the trading area in which it operates, all of whom sell item X and item Y. Competitor A sells item X for $0.49 and item Y for $0.-51; competitor B sells both items for $0.50; and competitor C sells item X for $0.51 and

item Y for $0.49. Plaintiff states that Hempfield was required to sell both items for $0.49, the lowest price charged by any competitor. Hempfield alleges that this requirement was used to increase the volume of sales at defendant's stores by making Hempfield a "loss leader." See United States v. Food and Grocery Bureau of Southern California, 43 F.Supp. 974 (S.D. Cal.1942), aff'd, 139 F.2d 973, 974 (9th Cir. 1943).

7. See Exhibits 3G and 3H, attached to plaintiff's motion for summary judgment and response in opposition to defendant's motion for summary judgment.

8. See Exhibits 3H, 3J and 3K attached to plaintiff's motion.

Books which were designed to insure that "like items" were sold at identical prices.

In response to defendant's interrogatories, plaintiff has indicated that Hempfield priced its merchandise using the following guidelines as to like items:

Merchandise sold in common by both defendant and the Bankrupt was sold at prices dictated by defendant, except during the approximate periods from March, 1965 to October, 1965 and from October, 1968 to March, 1969. During those periods, such merchandise was sold at prices determined in accordance with the Fox Grocery Company gross profit pricing structure designed to produce an overall budgeted gross profit figure of approximately 17.9% to 18.5%.[9]

For merchandise not sold in common:

The Bankrupt attempted to sell merchandise not sold in common at prices determined in accordance with the Fox Grocery Company gross profit pricing structure designed to produce an overall budgeted gross profit figure of approximately 17.9% to 18.5% as follows:

1965 and 1966: 17.9% at both stores
1967: 18.5% at both stores

1968, Jan. to Oct.: 18.5% at both stores

Oct. 1968 to Mar. 1969: 18.1% at Food Store 4064 and 18.5% at Food Store 4032.

At various times throughout the entire period, however, the Bankrupt was required to sell merchandise at prices lower than the prices determined as above.[10]

From the inception of this law suit, Kresge has accepted as true most of plaintiff's allegations regarding pricing requirements, purchasing restrictions and the other requirements contained in the license agreements. However, defendant differs drastically with plaintiff on what legal conclusions are to be drawn from the facts.

With this background, we will proceed to examine the issues presented by the motions before us.

I

*Discussion of the Jurisdictional Issue*

 Although substantive and jurisdictional issues are sometimes confusingly described in terms of the "effect" of particular conduct upon commerce as if a common question were presented, see e. g., Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 739–740, n. 3. (9th Cir. 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645, the substance of the two inquiries is not properly the same. Ford Wholesale Co. v. Fibreboard Paper Products Co., 344 F.Supp. 1323 (N.D.Cal.1972), aff'd, 493 F.2d 1204 (9th Cir. 1974), cert. denied, 419 U.S. 876, 95 S.Ct. 138, 42 L.Ed.2d 115. Whether a defendant's conduct constitutes a substantive violation of the Sherman Act is entirely a matter of congressional definition: Is the defendant's conduct of the type which Congress sought to prohibit, i. e., is that conduct a "restraint of trade" within section 1? The jurisdictional question on the other hand concerns the power of Congress to reach the defendant's conduct: Does the defendant's conduct have a sufficient relationship with interstate commerce so as to be a proper subject of federal regulation? See Rasmussen v. American Dairy Ass'n, 472 F.2d 517 (9th Cir. 1973), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003; Gough v. Rossmoor Corp., 487 F.2d 373, 375–376 (9th Cir. 1973).

In the Shreveport Rate Cases, (Houston, E. & Texas Ry. v. United States) 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), the Supreme Court decided that wholly intrastate activities were proper-

---

9. See Defendant's Interrogatories to Plaintiff (First Set), question 9.

10. *Id.*, question 14.

ly subject to regulation under the federal commerce power if, despite their local character, they had an economic impact on interstate commerce. In *Shreveport* the Court upheld the power of the federal government to regulate the railroad rates of an admittedly intrastate character and fixed by the authority of the state *because of the interstate affects* which such rates had.

The *Shreveport* holding has gradually been extended to general application, thereby obviating the need to search for some sharp point or line where interstate commerce ends and intrastate commerce begins in order to determine whether the Sherman Act applies. For the essence of the affectation doctrine was that the exact location of the line made no difference if the forbidden effects flowed across it to the injury of interstate commerce or to the hindrance or defect of Congressional policy regarding it. Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 232, 68 S.Ct. 996, 92 L.Ed. 1328 (1948).

■ It is now clear that the federal commerce power is as broad as the need that evokes it and encompasses not only the regulation of interstate commerce itself, but all measures necessary and proper to that end including purely intrastate activities, if necessary, to protect and foster interstate commerce. Rasmussen v. American Dairy Ass'n, *supra*, at 522. As stated by the Supreme Court in United States v. Women's Sportswear Manufacturing Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949):

" . . . The source of the restraint may be intrastate, as the making of a contract or combination ususally is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."

■ However, realizing that every enterprise, however localized, has some effect, however remote, on the flow of commerce among the states, the courts have recognized that some "localness," "remoteness" or "de minimus" factor must intervene or federal commerce power under the Sherman Act is boundless. Rasmussen v. American Dairy Ass'n, *supra*, at 526. Thus, in order for the interstate commerce allegations of a Sherman Act complaint to be jurisdictionally sound, they must allege either activities that are in the flow of interstate commerce or activities which though occurring on a purely local level, substantially affect interstate commerce. Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48, 50 (3rd Cir. 1973). See also Page v. Work, 290 F.2d 323 (9th Cir. 1961), cert. denied, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76. Thus, restraints which only affect interstate commerce in some insignificant degree or attenuated sense are not within the federal commerce power.

■ In similar fashion the courts in dealing with the substantive allegations of Sherman Act complaints have recognized that were § 1 to be read in the narrowest possible way, any commercial contract would be deemed to violate it. Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918). Therefore, the courts have adopted the so-called "rule of reason" to determine whether most business combinations or contracts violate the provisions of the Act. See Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). An analysis of the reasonableness of a particular restraint includes consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint, its effects, its history and the reason for its adoption. Chicago Board of Trade v. United States, *supra*, 246 U.S. at 238, 38 S.Ct. 242.

■ However, there are certain agreements or practices which, because

of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable, and therefore illegal, without elaborate inquiry as to the precise harm which they have caused or the business excuse for their use. Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 15, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). *Cf.* Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). These are referred to as per se violations. If a practice is held to be a per se violation the motives of the participants, the means of establishing the per se violation, the extent of the participants' market control, the effect of the agreement on prices and the amount of commerce affected are not relevant. United States v. McKesson & Robbins, 351 U.S. 305, 309–310, 76 S.Ct. 937, 100 L.Ed. 1209 (1956).

■ It is important to distinguish between the substantive requirements of the Sherman Act and its jurisdictional requirements. The per se doctrine only establishes the unreasonable nature of the restraint; it does not establish that the restraint has substantial interstate impact. See Uniform Oil Co. v. Phillips Petroleum Co., 400 F.2d 267 (9th Cir. 1968). We believe that the jurisdictional question requires independent examination since it is only when we find that interstate commerce is involved or affected that we reach the question of whether a substantive violation has occurred. The reasonableness *vel non* of the restraint is not relevant for jurisdictional purposes since even a per se violation may have no impact on interstate commerce or an impact so insignificant as to be beyond the federal commerce power. *Cf.* Page v. Work, *supra*, at 331–332. Therefore, in considering our jurisdiction we assume, but expressly do not decide, that the conduct complained of constitutes a substantive violation of the Sherman Act. Our sole inquiry is whether the prohibition of that conduct falls within the utmost extent of Congress' constitutional power.

Inherent in any attempt to formulate a general test of Sherman Act jurisdiction is the danger that the test will only further muddy the already murky waters. The formulations are, of necessity, so broad and generalized that instead of providing a guide to the solution of the problem they do no more than restate the issue. Doctors, Inc. v. Blue Cross of Greater Philadelphia, *supra*, at 51.

■ In laying the groundwork for a workable approach to the problem of Sherman Act jurisdiction one must distinguish between the two theories of jurisdiction, commonly referred to as the "in commerce" theory and the "affecting commerce" theory. If an alleged restraint occurs within the flow of interstate commerce, that is "in commerce," substantial effect on that commerce is presumed as a matter of law and no showing need be made that any particular amount of commerce has been affected. On the other hand, when dealing with restraints which are alleged merely to have affected interstate commerce, that effect must be substantial in order to justify federal regulation.

While there is language in many cases which indicates that a restraint must have a greater effect upon interstate commerce if it is applied "indirectly" rather than "directly," [11] see e. g., Page v. Work, *supra*, at 332; Bailey's Bakery, Ltd. v. Continental Baking Co., 235 F. Supp. 705 (D.Hawaii 1964); Spears Free Clinic and Hospital v. Cleere, 197 F.2d 125 (10th Cir. 1952), that distinction has been abandoned. In Wickard v.

---

11. Direct restraints are restraints imposed upon goods or services in the flow of interstate commerce and under the in commerce theory, substantial effect is presumed as a matter of law. Indirect restraints are those imposed on business or goods which merely compete with goods that flow in interstate commerce. See 1 Von Kalinowski, Antitrust Laws and Trade Regulations, ¶ 5.01(2) and cases cited therein (hereinafter referred to as Von Kalinowski).

Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L. Ed. 122 (1942) the Supreme Court said:

" . . . [e]ven if . . . [the] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.' " 317 U.S. at 125, 63 S.Ct. at 89.

See Doctors, Inc. v. Blue Cross of Greater Philadelphia, *supra,* at 51.

■ Nor is the traditional inquiry by many courts into the time of the imposition of the restraint any longer necessary since if commerce is found to have been affected, the fact that the restraint was imposed before, after or during the flow of interstate commerce, is immaterial. As stated by the Court in *Doctors:*

" . . . the Court in each case ends its inquiry when it has satisfied itself that the logical and therefore probable affect of the alleged act is to reduce the flow of goods in interstate commerce." 490 F.2d, at 53.

■ While Congress has determined its own criteria of substantive violations, it has left to the courts the task of deciding whether particular activities affect interstate commerce. *Cf.* United States v. Darby, 312 U.S. 100, 120, 61 S.Ct. 451, 85 L.Ed. 609 (1941). The concept of interstate commerce is an intensely practical concept drawn from the normal and accepted course of business. Therefore, the courts have eschewed the use of abstract mechanistic formulae in determining whether a particular course of conduct substantially affects interstate commerce. See, e. g., Doctors, Inc. v. Blue Cross of Greater Philadelphia, *supra,* at 51, and Rasmussen v. American Dairy Ass'n, *supra,* at 526, where the Court said:

"[16] There is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts. . . . "

Since we are dealing with matters of degree and the real world business nature of the Sherman Act's purposes permits of no easy solution, we are instructed to make a particularized judicial determination. See United States v. Yellow Cab Co., 332 U.S. 218, 231, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). Precedent in this area is unlikely to dictate the outcome in any given case. Rather, it is more likely to communicate a general sense as to how much of an impact local activities must have before the court will assume jurisdiction. Doctors, Inc. v. Blue Cross of Greater Philadelphia, *supra,* at 51.

In summary, we agree completely with the directive in Rasmussen v. American Dairy Ass'n, *supra,* where the Court said:

"[9] In essence the test is whether '[t]he facts of the particular situation . . . determine . . . [that the] relationship to interstate commerce is too tenuous in a practical sense to warrant federal control.' " (Citation omitted). 472 F.2d, at 524.

## II

*Can the Court Decide Jurisdiction on a Motion for Summary Judgment?*

Before turning to jurisdiction, we are confronted at the outset by two contentions raised by plaintiff which concern the power of the court to decide the jurisdictional issue on a motion for summary judgment. First, plaintiff contends that the "jurisdictional" issue and certain issues on the merits are so closely related that the court should reserve determination of the jurisdictional issue until trial on the merits. Secondly,

plaintiff submits that the jurisdictional issue must be left for determination by a jury.

■ In a memorandum opinion deciding discovery disputes, dated February 27, 1974, in denying defendant's motion for an evidentiary hearing on the issue of subject matter jurisdiction, we said:

"The motion for an evidentiary hearing filed by defendant is also denied. When discovery is complete and the facts are available, defendant may, if he desires to do so, file a motion for summary judgment. We agree that the court may dispose of the question of jurisdiction as well as other questions on a motion for summary judgment. . . ."

We now reaffirm our earlier decision and hold that the court may decide the jurisdictional issue on a motion for summary judgment.

In support of his past argument, plaintiff relies on McBeath v. Inter-American Citizens for Decency Committee, 374 F.2d 359 (5th Cir. 1967), cert. denied, 389 U.S. 896, 88 S.Ct. 216, 19 L. Ed.2d 214 (1967). The district court in McBeath dismissed a Sherman Act claim holding that plaintiff had failed to show that the conduct complained of had the requisite impact on interstate commerce. In reversing, the Appeals Court, explicitly relying on Land v. Dollar, 330 U.S.

731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947),[12] held that the issue of the effects of the conduct complained of on interstate commerce was so intertwined with the merits of the case that it was error for the district court to dismiss the suit without giving plaintiff a full chance to prove his case on the merits.[13]

We do not believe that the case before us falls within the holding of Land v. Dollar, n. 12, supra, since even if the provisions of the license agreements complained of were held to constitute Sherman Act violations, per se or otherwise, plaintiff must still show that the violations either occurred in the flow of commerce or affected it. Furthermore, we believe that unlike the McBeath situation, we have abundant evidence before us on which to base our determination.

■ We also hold that the jurisdictional question is best suited to trial by the court and, therefore, need not be submitted to the jury.

■ While there are instances in which courts have treated the questions of whether the alleged violation occurred in or affected interstate commerce as jury questions, see e. g., United States v. Pennsylvania Refuse Removal Ass'n, 357 F.2d 806 (3rd Cir. 1966), cert. denied, 384 U.S. 961, 86 S.Ct. 1588, 16 L. Ed.2d 674 (1966); Las Vegas Merchant Plumbers Ass'n v. United States, supra, we believe that in this case the best

12. In Land v. Dollar, supra, the complaint alleged that members of the U. S. Maritime Commission were unlawfully holding shares of Dollar stock under a claim that the stock belonged to the United States. The district court dismissed the action on the ground that the United States was immune from suit. In affirming a reversal of that dismissal, the Supreme Court said:
"[A]lthough as a general rule the District Court would have authority to consider questions of jurisdiction on the basis of affidavits as well as pleadings, this is the type of case where the question of jurisdiction is dependent on decision of the merits." 330 U.S., at 735, 67 S.Ct., at 1011.
The court reasoned that since if the plaintiffs were to prevail on either of their theo-

ries on the merits, i. e., that the Commission was without authority to acquire the shares or that the contract was simply a pledge of the shares rather than an outright transfer then they would also prevail on the jurisdictional issue. See Gulf Oil Corp. v. Copp Paving Co., Inc., 419 U.S. 186, 196, n. 10, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) (Douglas, J., dissenting).

13. The McBeath court distinguished Page v. Work, supra, where the use of the summary judgment procedure was upheld because the court there had abundant evidence before it on which to base its decision. Thus, it appears the McBeath decision was premised on the fact that the district court lacked a sufficiently complete record on which to base its determination of jurisdiction.

approach is to treat the question of jurisdiction as triable to the court if reasonably separable from the substantive allegations. The difference is this: If coverage is treated as substantive for purposes of mode of trial, the issue of whether a cause of action is stated must be left to the jury in cases in which the underlying facts are not in dispute, but different inferences may be drawn from them. Thus, on the same business arrangements, one case may be decided one way and another in a different way as the jury may find the arrangements did or did not affect commerce. We believe that the better approach is to treat the reach of the Sherman Act as a matter of law so that the perimeter of the statute can be worked out in the appellate courts. 5 Moore's Federal Practice, ¶ 38, 36 [2.–2], at 300.

The existence of an important, difficult or complicated question of law, where there is no genuine issue of material fact, is not a bar to summary judgment. 6 Moore's Federal Practice, ¶ 56.-16 at 2447. We are aware of the admonition that summary procedures should be used sparingly in complex antitrust cases, Poller v. Columbia Broadcasting, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). We find, however, that this case is not of the type where summary judgment is inappropriate.

In such cases as United States v. Employing Plasterers' Ass'n, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954), Mandeville Island Farms v. American Crystal Sugar Co., *supra,* and United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947), the Supreme Court has reviewed interstate commerce issues in the context of dismissals of antitrust suits prior to trial on the merits. These dismissals, however, were not based on motions for summary judgment but rather on motions to dismiss for failure to state a claim under Rule 12, F.R.Civ.P. See Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 196, n. 10, 95 S.Ct. 392, 42 L.

Ed.2d 378 (1974). Other courts have treated motions for summary judgment as motions to dismiss. See e. g., A. Cherney Disposal Co. v. Chicago and Suburban Refuse Disposal Ass'n, 484 F. 2d 751, 753 (7th Cir. 1973), cert. denied, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755; Deaktor v. Fox Grocery Co., 332 F.Supp. 536 (W.D.Pa.1971), aff'd 475 F.2d 1112 (3rd Cir. 1973), cert. denied, 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86.

Summary judgment procedures have been used to resolve jurisdictional issues. See e. g., Page v. Work, *supra,* and Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2d Cir. 1964), and we find that the challenge to the court's jurisdiction may be decided on defendant's motion since it is a legal issue and the record before the court is adequate to decide it.

### III

#### *Decision on the Jurisdictional Issue*

". . . [T]he inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, *except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented.* (Footnote omitted). For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, *and a showing of actual or threatened effect upon interstate commerce,* the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence." Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 234, 68 S.Ct. 996, 1005, 92 L.Ed. 1328 (1947) (Emphasis added).

Defendant's motion for summary judgment is premised upon the argument that this case involves a situation in

which no aspect of substantial effect * on interstate commerce can be shown in the sum of the facts presented, there having been no showing of an actual or threatened effect upon interstate commerce.

Plaintiff contends that the court has jurisdiction over the subject matter of this action under both theories of federal commerce power enunciated in Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48 (3rd Cir. 1973), that is, that defendant's conduct occurred in the flow of interstate commerce (in commerce) or that if found to have occurred on a purely local level, that such conduct affected interstate commerce so as to bring this action within the expansive purview of § 1.

Upon careful review of the entire record, the briefs of both parties and the authorities cited therein, we conclude that the activities complained of did not occur in the flow of interstate commerce nor did they substantially affect it.

A. *In Commerce Theory*

The two theories upon which the existence of interstate commerce can be predicated differ in one important respect: where the transaction occurs in the flow of commerce, there is no necessity of showing that it affects interstate commerce, Mandeville Island Farms v. American Crystal Sugar Co., *supra,* but where the transaction is not in the flow of commerce, and only affects interstate commerce, plaintiff is required to establish a nexus between the restraint and the flow of commerce. Despite language in some cases indicating otherwise, it is not necessary for jurisdictional purposes that plaintiff demonstrate an adverse effect; all that need be shown is a substantial effect. See 1 Von Kalinowski, ¶ 5.01[1], at 5–7, 5–8, n. 8.

Plaintiff contends that the restraints herein alleged are per se violative of the Sherman Act inasmuch as they fixed prices and interfered with Hempfield's ability to exercise its independent judgment. Therefore, plaintiff argues that the requisite showing of the necessary effect on interstate commerce has been made. Plaintiff relies on United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948), in which the Supreme Court held that " . . . where a complaint charges that defendants have engaged in price fixing . . . then the amount of commerce involved is immaterial because such restraints are illegal per se." *Cf.* Yellow Cab Company of Nevada v. Cab Employers, Automotive and Warehousemen, Local No. 881, 457 F.2d 1032, 1034 (9th Cir. 1972).

Plaintiff's argument cannot withstand close scrutiny. In attempting to invoke the per se doctrine before any showing has been made of an effect upon interstate commerce, plaintiff is, in effect, putting the cart before the horse. Given an in commerce context for the alleged per se violations, we would agree with plaintiff. See United States v. Richter Concrete Corp., 328 F. Supp. 1061 (S.D.Ohio 1971). But that showing must precede application of the per se doctrine. It does not follow from it. The crucial nature of the distinction was explained in Las Vegas Merchant Plumbers Ass'n v. United States, *supra.*[14]

---

* The words "effect" and "affect" are frequently used interchangeably.

14. In *Las Vegas Merchant Plumbers, supra,* government counsel argued that it was plainly not for the jury to decide whether a per se violation has the necessary effect upon commerce; that price fixing at any level necessarily affects interstate commerce as a matter of law and that the law conclusively presumes such an effect. The Ninth Circuit answered this argument: "Assuming an 'in commerce' situation, we can agree. But when the 'affect' on commerce theory is presented, it is clearly a question of fact whether wholly intrastate activities affect interstate commerce in a manner proscribed by the Sherman Act. After this question is decided, then the per se doctrine may well apply." 210 F.2d at 748. See also United States v. Richter Concrete Corp., *supra.*

". . . True, a price fixing conspiracy which operates on or within the flow of interstate commerce affects that commerce as a matter of law. But a price fixing conspiracy at a purely local or intrastate level does not, as a matter of law, affect the flow of commerce. Whether a purely local or intrastate conspiracy unreasonably restrains interstate commerce is primarily a factual question, i. e., does the local price fixing conspiracy affect substantially the flow of interstate commerce? If the answer is yes, then only are we concerned with the effect of the price-fixing under the per se doctrine. In fact, unless there is a finding that the local and intrastate activities complained of and as alleged . . . substantially affected interstate commerce, there is no jurisdiction in a district court over the alleged Sherman Act violation. . . ." 210 F.2d, at 747.

Plaintiff seems to argue that since the restraints are alleged to be per se violations of § 1 they are subject to a less rigorous jurisdictional test than other restraints. That argument is without merit. The jurisdictional test is the same. See Mandeville Island Farms v. American Crystal Sugar Co., *supra*; Savon Gas Stations No. Six, Inc. v. Shell Oil Co., 309 F.2d 306 (4th Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719.

In Page v. Work, supra, the publisher of a local newspaper which printed only legal advertisements argued that a trade association of local newspapers had monopolized the market for legal advertisements. Among his claims the publisher alleged that the trade association had engaged in price fixing and horizontal market divisions, and that since such restraints were illegal per se under § 1 of the Sherman Act, there could be no issue with respect to jurisdiction. The court rejected the plaintiff's contention, not-

ing that for purposes of jurisdiction, there must be an effect upon interstate commerce, and that because a restraint is of an unreasonable nature it does not follow that it must affect interstate commerce. See United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 297, 65 S.Ct. 661, 89 L.Ed. 951 (1945).

In short, plaintiff cannot avoid the burden of showing an impact on interstate commerce merely by alleging that the conduct complained of constitutes a per se violation of the Sherman Act. Therefore, consideration of the nature of the alleged violation is premature until we have determined whether that conduct either occurred in or affected interstate commerce.

In support of its argument that the conduct complained of occurred in the flow of commerce, plaintiff relies on the following facts. Defendant's employees at its home offices in Michigan devised and adopted the restraints and incorporated them into the license agreements which they drafted. The policies applied not only to the two stores directly in question but to all of defendant's supermarket licensees throughout the United States as well. The particular agreements involved in this case were finally executed in Detroit by defendant and transmitted to Hempfield.

Furthermore, plaintiff alleges that from 1964 through 1968, Hempfield sold a total of over $20 million in merchandise which was subjected to the restraints, of which approximately eighty percent was manufactured outside of Pennsylvania and shipped into the state in interstate commerce. Of these goods, plaintiff asserts that in each year, more than $400,000 worth were shipped directly to Hempfield in interstate commerce from sources outside of Pennsylvania.

Although defendant contests the volume of plaintiff's interstate transactions [15] we will deal with the al-

15. Plaintiff's allegation that Hempfield made $400,000 worth of annual purchases in inter-
state commerce by direct shipments from out of state suppliers is challenged by de-

leged facts in the light most favorable to plaintiff as we must upon a motion for summary judgment.[16]

In our view, the facts concerning the place of execution, the drafting of the agreements, and the interstate nature of both parties' business do not lend any support to plaintiff's argument that commerce has been affected as a matter of law.

". . . The test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business." Page v. Work, *supra*, 290 F.2d, at 330.

Thus, our jurisdictional inquiry is limited to ascertaining whether the alleged § 1 violations occurred in or affected interstate commerce.

Plaintiff relies on Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc., 371 F.Supp. 701 (S.D. N.Y.1974) aff'd, 493 F.2d 1352 (2nd Cir. 1974), Northern California Pharmaceutical Ass'n v. United States, 306 F.2d 379 (9th Cir. 1962), cert. denied, 371 U. S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99, United States v. Erie County Malt Beverage Distributors Ass'n, 264 F.2d 731 (3rd Cir. 1959) and United States v. Food and Grocery Bureau of Southern California, *supra*, n. 6, in his attempt to establish that the conduct complained of here occurred in the flow of interstate commerce.

Defendant, citing C. S. Smith Metropolitan Market v. Food & Grocery Bureau of Southern California, 33 F.Supp. 539 (S.D.Cal.1939); Cliff Food Stores v. Kroger, 417 F.2d 203 (5th Cir. 1969); Brosious v. Pepsi-Cola Co., 155 F.2d 99 (3rd Cir. 1946); Knuth v. Erie-Crawford Dairy Cooperative Ass'n, 395 F.2d 420 (3rd Cir. 1968) cert. denied, 410 U. S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278, Savon Gas Stations No. Six v. Shell Oil Co., *supra*, and St. Anthony-Minneapolis v. Red Owl Stores, 316 F.Supp. 1045 (D.Minn.1970), argues that the in commerce theory cannot apply to the case at bar.

In short, defendant argues that even if the goods subject to the restraints had at one time been in the flow of commerce, they ceased to be in commerce when they reached the shelves of plaintiff's stores. Accordingly, defendant contends that the subsequent sale of such goods to retail customers was a purely intrastate transaction.

Plaintiff argues that the flow of commerce did not terminate when the goods came to rest on its shelves, but rather that the retail sale of groceries by its very nature, contemplates a continuity of movement from the supplier to the ultimate consumer and that, therefore, the goods subjected to the alleged restraints remained in commerce.

We have already indicated that it is not always easy to determine where interstate commerce ends and intrastate commerce begins. Furthermore, if the conduct affects interstate commerce, inquiry as to whether it occurred locally or in commerce is unnecessary. See United States v. Women's Sportswear Manufacturing Ass'n, *supra*; U. S. v. Employing Plasterers' Association, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed.

---

fendant on several grounds: first, Anthony C. Polito, the sole shareholder of Hempfield, in his deposition, admitted that he had no data available to support that figure (See excerpts from Polito deposition, attached as tab 3b to Kresge's first motion for summary judgment). While Polito in a Supplemental Affidavit, purports to document that figure, defendant claims that an investigation of Hempfield's creditors with out of state addresses discloses that an overwhelming majority shipped merchandise to plaintiff from distribution centers which they maintained in Pennsylvania. (See Richmond Affidavit, tab 6, to defendant's earlier motion for summary judgment).

16. The allegations in the complaint are to be taken as true on motion for summary judgment except as they may be contradicted by stipulated fact, affidavit or other material properly submitted to the court. *Cf.* Hiern v. St. Paul-Mercury Indemnity Co., 262 F.2d 526, 529 (5th Cir. 1959).

618 (1954). However, since, if the conduct occurred in the flow of commerce, there is a conclusive presumption of an affect on that commerce, for jurisdictional purposes, we must determine whether the conduct alleged occurred in commerce as plaintiff contends.

For purposes of delimiting the respective spheres of intrastate and interstate activities, a concept has developed relating to the movement of commodities between the states which says that interstate activities end when the commodities come to rest within the state. United States v. Food and Grocery Bureau of Southern California, 43 F.Supp. 966, 977 (S.D.Cal.1942). See e. g., C. S. Smith Metropolitan Market v. Food & Grocery Bureau of Southern California, *supra*; see also Cliff Food Stores v. Kroger, *supra*, at 210, a case under the Robinson-Patman Act, 15 U.S.C.A. § 13, where the court said:

"The sales complained of in the instant case were intrastate in nature. When food products are delivered to the retail grocer, title thereto passes to him. Even though many of the products are derived from out of state, the merchant's sales to the general public are not in the flow of commerce because the moment the products reach his shelves 'they come to rest and cease to be "in the flow" of interstate commerce.'" (Citations omitted.[17]

Plaintiff contends that the "come to rest" doctrine has itself been laid to rest by the holding of subsequent cases and cites United States v. Food and Grocery Bureau of Southern California, *supra*; Northern California Pharmaceutical Ass'n v. United States, *supra*; United States v. Erie County Malt Beverage Distributors Ass'n, *supra*, and Harlem River Consumers Coop, Inc. v. Associated Grocers of Harlem, *supra*, in support of its argument.

In United States v. Food and Grocery Bureau of Southern California, *supra*, the court states that the widest application of the come to rest doctrine has been in cases ". . . upholding the regulatory powers, especially the taxing power, of a state over goods in transit during their stay in the state." 43 F. Supp. at 977.

". . . But the courts have warned us not to accept the concession which the federal government is thus willing to make to state sovereignty in matters of this character in a dogmatic sense. Specifically have they warned us that these cases do not delimit the extent of federal control over interstate commerce." (Citations omitted) Id.

 While we recognize the limited use of the come to rest doctrine, we believe it has continued viability in Sherman Act cases to determine whether the acts complained of occurred in interstate commerce, *Cf.* Rasmussen v. American Dairy Ass'n, *supra*, at 526. We use it here for that limited purpose. We hold that the retail sale of groceries to the general public are transactions consummated locally, involving commodities of a local character having been previously diverted from the flow of commerce. We hasten to add, however, that this holding does not preclude jurisdiction if the restraints affected interstate commerce.

We believe that this is consistent with the logic of United States v. Food and Grocery Bureau of Southern California, *supra*,:

"In assaying price-fixing agreements, the test is not so much whether the effect is felt after the movement of goods has reached the end of the interstate journey. The inquiry seeks the effect upon prices in the market and *if this effect be shown,* it matters not that the movement has come to a halt within the state. . . ." 43 F.Supp. at 977. (Emphasis added).

 While there are instances in which goods shipped into a state are

17. See opinion of March 14, 1972.

properly considered to remain within the flow of commerce,[18] the base at bar is not among them.

## B. *The Affecting Commerce Theory*

 When the transaction complained of is not in the flow of commerce, there may be difficulty in establishing the nexus between the restraint and the flow of interstate commerce. Accordingly, the plaintiff in a Sherman Act case has a much greater burden of establishing the requisite impact on commerce resulting from the conduct complained of if the effect theory is being relied on. 1 Von Kalinowski, ¶ 5.01(2), at 5–23.

As we have previously indicated, the time the restraint is imposed and the nature of the restraint, i. e., direct or indirect, are of no consequence if there is a substantial effect on interstate commerce. The question here then is whether plaintiff has shown any substantial effect, either real or threatened, on interstate commerce resulting from the conduct complained of.

 Congressional power is not over persons but over practices and it is irrelevant that a person is in some way engaged in interstate commerce if the practice complained of is in no way related to that commerce. *Cf.* Yellow Cab Co. of Nevada v. Cab Employers, Automotive & Warehousemen, Local No. 881 *supra*. See Page v. Work, *supra*, at 329; Savon Gas Stations No. Six v. Shell Oil Co., *supra*. See also United States v. Bensinger Co., 430 F.2d 584, 588 (8th Cir. 1970) and United States v. Yellow Cab Co., *supra*, where the Supreme Court held that there was Sherman Act jurisdiction over that portion of a complaint which alleged that the defendant cab company had attempted to monopolize the carrying of passengers between two interstate railroad terminals in Chicago, but held that there was no jurisdiction over the allegations that the same company had violated the Act in its intracity carriage.

Kresge argues that the entire thrust of plaintiff's complaint is that the defendant interfered with the retail sales practices of Hempfield's two supermarkets. Assuming arguendo that this is true, defendant asserts that plaintiff has failed to show any effect on Hempfield's interstate commerce, let alone a substantial effect. In support of this argument Kresge relies on the following facts:

(1) Kresge did not sell any goods to Hempfield;

(2) Kresge did not dictate or restrict Hempfield's sources of supply;

(3) Kresge did not in any way control or attempt to control the price Hempfield paid for its merchandise; and

(4) Kresge did not in any way affect any other retail outlet competing with Hempfield.

 Therefore, defendant argues that the mere fact that Hempfield made purchases in interstate commerce is irrelevant because Hempfield has failed to make the necessary showing of a substantial effect on those purchases resulting from the conduct complained of. Defendant also contends that Hempfield has such a miniscule part [19] of the intrastate food sales market that any possible

---

18. The following are instances where goods brought from without the state are considered to remain within the flow of interstate commerce: (1) where the shipment is made in anticipation of needs of specific customers rather than on prior orders or contracts and there is, therefore, a practical continuity in transit necessary to keep a movement of goods "in commerce." See United States v. Richter Concrete Corporation, *supra*,; (2) where the goods are purchased by the retailer from the supplier to meet the needs of specified customers pursuant to some understanding with the customer, although not for immediate delivery; and (3) where the goods are purchased by the retailer based upon the anticipated needs of specified customers. See Walker Oil Co. v. Hudson Oil Co. of Missouri, 414 F.2d 588 (5th Cir. 1969); Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1945). See also Country Maid v. Haseotes, 324 F.Supp. 875 (E.D.Pa.1971).

19. In support of its argument that Hempfield's share of the local retail market was

impact of the alleged restraints was merely incidental to local activity and insufficient to confer Sherman Act jurisdiction upon the court.

■ After a careful and thorough examination of the record we conclude that the plaintiff has failed to make the required showing of a substantial impact on interstate commerce resulting from the conduct of defendant either qualitatively or quantitatively.[20] Therefore, we believe it proper to grant Kresge's motion for summary judgment.

In Page v. Work, supra, the shareholders of a corporation (Consolidated) instituted a derivative action against the competitors of the corporation and a competitive bureau. Consolidated published a newspaper in the Los Angeles area concerned primarily with legal advertising. Plaintiffs alleged that the defendants had engaged in a conspiracy and numerous other antitrust violations which caused the dissolution of the corporation in which plaintiffs held stock. While the court found that both the plaintiff corporation and the defendants were involved in interstate commerce by the purchase of newsprint from out of state sources, publication of some national news and sales to out of state subscribers, it determined that the elimination of Consolidated as a competitor would not interfere with the flow of national news or advertising and that the business of legal advertising in the Los Angeles area was wholly intrastate. Accordingly, the court adopted the conclusion of the district court:

"The interstate trade or commerce in which plaintiff and defendants engage did not suffer any anti-competitive effects from the acts of defendants of which plaintiff complains." 290 F.2d at 329.

Even though the newspapers were subject to federal regulation because of their interstate activities, the court held that it lacked jurisdiction over plaintiff's claim because interstate commerce was not substantially affected by the conduct complained of.

Plaintiff argues that Page v. Work is distinguishable since the court's analysis there centered on the finding that the relevant product market for monopolization purposes was the purely intrastate legal advertising market within Los Angeles County. Plaintiff contends that because market control is not relevant in price-fixing cases, Cf. United States v. McKesson & Robbins, Inc., supra, that

---

miniscule, defendant submitted an Affidavit of James F. Stangl, a Research Analyst and Client Service Representative employed by Management Science Associates, Inc. (Tab 5 to Kresge Motion for Summary Judgment). Stangl conducted an on-site survey of retail outlets within a 5-mile radius of the two stores to make a competitive profile of the markets in which the two K-Mart Food Stores operated by Hempfield were involved. The results of the survey indicate that Food Store 4032 had 17 competitors in the supermarket business, that there were 26 "Mom and Pop" convenience grocery stores, 2 delicatessens, 3 drug stores and 4 mass merchandise stores within a five mile radius. (See Exhibit A to Stangl Affidavit). For Food Store 4064, there were 29 supermarket competitors, 7 "Mom and Pop" convenience grocery stores, 8 delicatessens, 5 drugs stores and 14 mass merchandise stores (Exhibit B to Stangl Affidavit). The Stangl Affidavit also contains various published data on retail food stores. The Stangl findings were interpreted by Alfred A. Kuehn, President of Management Science Associates (see Tab 4 to Defendant's Motion). Defendant, however, has objected to the Kuehn affidavit claiming it is inadmissible hearsay and must be ignored. Finding that the Kuehn affidavit is in the nature of expert testimony, we have not relied upon it. However, we take judicial notice of the highly competitive market in which the Hempfield Stores were located, of which they had in the vicinity of 1% of the market.

20. Substantial restraints may be viewed either quantitatively or qualitatively. The quantitative approach looks to the proportion of the total volume of the flow of commerce in a line of goods or services which is affected by the restraints. Qualitative insubstantiality is the standard used to determine whether the restraint is essentially local in nature without such effect as would justify the assumption of federal jurisdiction. See generally, 1 Von Kalinowski, ¶ 5.01(4), at 5–105.

case does not apply. We believe, however, that *Page* does serve to illuminate the metes and bounds of Sherman Act jurisdiction and here, as in *Page,* participation by either or both parties in interstate commerce does not suffice to confer jurisdiction. That commerce must have been affected.

Plaintiff, in attempting to establish that the amount of commerce affected was not quantitatively insubstantial, argues that the court must consider not only Hempfield's interstate purchases but also those of other Kresge food licensees who were similarly restricted, citing Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48 (3rd Cir. 1973).

▮ *Doctors* was an action by a single hospital against Blue Cross, a hospitalization insurer, and Hospital Survey Committee, Inc. (HSC), a private non-profit corporation which served as an advisory planning agency for the coordination of hospital and health services in the Philadelphia area. In 1972, Blue Cross sought to terminate plaintiff hospital's membership status. In the complaint plaintiff claimed that this action was taken pursuant to a scheme to control the area's hospital services market. Both defendants in *Doctors* filed motions to dismiss, arguing like Kresge does here, that the court lacked jurisdiction of the subject matter of the complaint. Defendants contended that the complaint alleged only restraints in intrastate trade or commerce. Plaintiff on the other hand, as does plaintiff here, claimed that the court had jurisdiction under both theories, that is, that the activities complained of occurred in the flow of interstate commerce, and alternatively, that the activities substantially affected interstate commerce. The district court granted defendant's motion to dismiss. The Third Circuit reversed and held that the allegations with respect to the affecting commerce theory were sufficient to confer jurisdiction. The court reasoned that while the individual plaintiff purchased only $233,000

worth of supplies from out-of-state sources, the defendant's conduct was directed at all other hospitals in the area:

". . . . Moreover, the complaint alleges that Doctors activities are typical of those hospitals supplying hospital and health services throughout the United States. As a result, we must assume that like volume of out-of-state supplies are purchased by the approximately 100 other hospitals located in the Greater Philadelphia area. Since the overall scheme alleged in this complaint is directed at them also, this interstate commerce will be affected as well.

"The key question in the case then is whether these clear 'effects' on interstate commerce, caused by the activities alleged, are 'substantial' enough to confer jurisdiction. . . . " 490 F.2d at 51.

The court concluded that they were. From this, plaintiff argues that the volume of interstate purchases made by other licensees of Kresge must be considered and not merely that of the Hempfield stores. We disagree.

In *Doctors,* the defendant purchased more than 50% of all hospital services sold in Philadelphia. Because of this economic power in the hospital services market Blue Cross has sufficient market control to justify consideration of the effects which its policies would have on not only Doctors but on other hospitals as well. The facts before us are in stark contrast with that situation. Kresge does not even participate in, let alone control, the groceries market in western Pennsylvania. It is also clear that Kresge couldn't exert any substantial influence on the overall retail groceries market through its licensees. Therefore, we find that only Hempfield's interstate commerce activities are relevant to the issue of substantial effect on that commerce in this case.

Plaintiff argues that even if only Hempfield's purchases are deemed relevant to the issue of substantial effect on interstate commerce that the purchase

of $400,000 worth of goods annually in interstate commerce satisfies the requirement that the effect be substantial, citing Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969).

In our opinion and order of March 14, 1972, we said:

"The theory of plaintiff appears to be that the alleged price-fixing caused the bankrupt to be unable to continue in business and unable to continue buying goods and thus about $400.-000.00 per year of merchandise ceased flowing from interstate commerce into its stores. The plaintiff argues that consequently there was an affect on interstate commerce which Fortner has already held to be substantial enough to give us jurisdiction."

In the same opinion we stated that the Polito Affidavits would bring the instant case within the holding in Fortner. Since that time, the parties have disputed whether Fortner establishes a test for jurisdiction in this case.

In Fortner, plaintiff alleged an illegal tying arrangement between the defendant steel company and its wholly owned credit corporation whereby, as a condition to obtaining loans from the credit corporation for the purchase and development of certain land, plaintiff was required to agree to purchase at unreasonably high prices, prefabricated houses manufactured by defendant for erection on the lots purchased with the borrowed money. After concluding that credit was indistinguishable from other goods and services when used as the "tying product," the Court held that the tying arrangements alleged were per se illegal if defendant had sufficient economic power with respect to the tying product (credit) to appreciably restrain free competition in the market for the tied product (prefabricated housing) and a not insubstantial amount of interstate commerce was affected. The Court remanded the case for trial finding it impossible to conclude on the record presented to it that the credit corpora-

tion did not have a competitive advantage in the credit market as a matter of law.

In considering whether a substantial amount of interstate commerce was affected, the Court in Fortner, said:

" . . . . For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, therefore, the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit. . . ." 394 U.S. at 502, 89 S.Ct. at 1258.

The Court added that all that is required is enough commerce in terms of dollar volume so as not to be de minimis. Plaintiff contends that $400,000 is not de minimis, and is sufficient as a matter of law to confer jurisdiction.

We believe that plaintiff's reliance on Fortner is misplaced. In tying cases, the fact that the sale of the desired product (the tying product) is conditioned upon purchases of some other product (tied product) necessarily means that commerce in the tied product is foreclosed. Therefore, interstate commerce in the tied product is affected. On the other hand, in the case under consideration there has been no showing that the interstate commerce in which Hempfield engaged, whatever its volume, was affected by the license agreements. To the contrary, Hempfield was free to purchase from whomever it wanted at the best terms available.

Furthermore, when they talk about substantiality of commerce in the Fortner case, it is not for the purpose of determining subject matter jurisdiction at all; it is for the purpose of determining the ecomomic power of the manufacturer and his relationship to the ties and to the tying product. Therefore, in determining whether defendant had sufficient economic power in the marketplace, the Court held that the scope of inquiry was not properly limited to the single

plaintiff's volume of interstate commerce. The fact that a tie is not unlawful unless there is sufficient economic power over the tying product to effectively require the purchaser to also purchase the tied product necessitated this analysis. Here, on the other hand, we are concerned neither with a sale of goods between the parties nor a tie. Therefore, we believe that *Fortner* does not relieve plaintiff from its burden of showing that the interstate commerce in which it participated was substantially affected by the conduct complained of.

Defendant contends that the elimination of Hempfield as a competitor could not have affected interstate commerce because it would have no substantial effect on interstate commerce, the demand for groceries being "inelastic."[21] Plaintiff argues that defendant's argument runs afoul of the Supreme Court's reading of the Sherman Act as evidenced by Klor's Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

Plaintiff in *Klor's* was a retail merchandiser who dealt in household appliances. He sued a chain of national department stores (and manufacturers and distributors of appliances in which he dealt) alleging that it had conspired with defendant manufacturers and distributors not to sell to plaintiff or to sell only at discriminatory prices.

The defendants did not deny these allegations but contended that the complaint failed to state a cause of action. Defendants submitted unchallenged affidavits showing that there were hundreds of other retailers in the area who sold many competing brands of appliances including those which defendants refused to sell to Klor's. In reversing the summary judgment granted defendant by the district court, the Supreme Court said:

"The holding, if correct, means that unless the opportunities for customers to buy in a competitive market are reduced, a group of powerful businessmen may act in concert to deprive a single merchant, like Klor, of the goods he needs to compete effectively." 359 U.S. at 210, 79 S.Ct. at 708.

The Court held that the allegations clearly established a group boycott which interfered with the "natural flow" of an appreciable amount of interstate commerce.

"This combination takes from Klor's its freedom to buy appliances in an open competitive market and drives it out of business as a dealer in the defendants' products. It deprives the manufacturers and distributors of their freedom to sell to Klor's at the same prices and conditions made available to Broadway-Hale and in some instances forbids them from selling to it on any terms whatsoever. It interferes with the natural flow of interstate commerce." 359 U.S. at 213, 79 S.Ct. at 710.

We do not feel that the case at bar fits within the logic of *Klor's*. Contrary to the above quoted passage, the restraints in the case *sub judice* did not deprive Hempfield of its freedom to purchase in an open, competitive market or drive it out of business as a retailer in its distributor's product. Nor did it deprive the distributors or producers of their freedom to sell to Hempfield under terms determined in a free and competitive market. We find that the conduct complained of did not interfere with whatever interstate business in which Hempfield may have been engaged.

The mere fact there are many other grocers and the market is highly competitive does not preclude jurisdiction. But the fact is, the Court in *Klor's* dealt with the interstate commerce issue in one sentence: "The business of manufacturing, distributing and selling

---

21. "Inelastic" simply means that the demand for groceries is constant. Therefore, defendant argues that Hempfield's going out of business could not have affected interstate commerce. See Appendix C to defendant's brief.

household appliances is in interstate commerce." 359 U.S. at 209, 79 S.Ct. at 708. Having found that the conduct occurred in interstate commerce, the only remaining question was whether the alleged conduct constituted a violation of the Sherman Act.

We have already decided that the *sale* of groceries in a local area is not in interstate commerce. Therefore, plaintiff, in order to establish jurisdiction, must show that the restraints complained of affected interstate commerce.

In United States v. Starlite Drive-In, Inc., 204 F.2d 419 (7th Cir. 1953), defendants who operated drive-in theaters were charged with conspiring to fix admission prices. The District Court dismissed the complaint for failure to allege that interstate commerce was affected. In affirming the dismissal, the Court of Appeals stated:

" . . . [N]o agreement is asserted between exhibitors (defendants) and either distributors or producers, no agreement which bears any relation to the price paid by the defendant exhibitors for the films—in fact, no agreement relating in any manner or form to the films but only to the price which exhibitors will charge their theatre patrons . . . . It is evident that the interstate nature of the dealings between the distributors and the exhibitors . . . is terminated prior to their exhibition. A decision, therefore, simmers down to the narrow question as to whether the price-fixing agreement charged has or could have any appreciable effect upon the flow of films in interstate commerce." 204 F.2d at 420–421.

The court concluded that no such facts were alleged and it was not reasonably discernible how or in what manner the condemned agreement affected commerce.

"Certainly there is no basis for a claim that the movement of films in interstate commerce was either enhanced or diminished or that any discrimination resulted either to exhibitors in the procurement of films or to their patrons in viewing the films. Distributors were as free to deal with exhibitors, and the latter were as unfettered in the procurement of film as they would have been in the absence of the charged conspiracy. The agreement had nothing to do with the price which the distributor received for its film or the price which the exhibitor paid for it. The agreement was between local parties and related solely to a business that was typically intrastate in its nature." *Id.*

We have already discussed the limited value of precedent in cases dealing with the jurisdictional inquiry under the Sherman Act. However, we feel that the reasoning of the court in *Starlite Drive-In* is applicable to the case before us. Hempfield has not alleged that the restraints complained of involved any restrictions on its sources of supply, either in Pennsylvania or from out of state. Furthermore, there is no evidence of any agreement affecting the price which Hempfield was to pay for its supplies. The sole complaint is that the defendant regulated the prices at which Hempfield could sell its merchandise.

We do not believe that any evidence exists which shows or suggests that the interstate commerce in groceries was either enhanced or diminished by the agreement. Nor do we believe that the conduct complained of restricted Hempfield's latitude in dealing with its suppliers. In short, we find that the alleged conduct had nothing to do with whatever interstate commerce Hempfield might have engaged in during the course of its operation of the stores in question. Therefore, we have no jurisdiction.[22]

22. We have carefully examined each of the other restraints alleged and conclude that none occurred in or substantially affected interstate commerce.

## IV

### Was There a Restraint of Trade?

Although we have decided that the practices complained of neither occurred in nor substantially affected interstate commerce, we believe that the interests of judicial economy will be served if we proceed to consider whether the practices under attack were restraints of trade as that term is used in § 1. Our reasons are two-fold: (1) both parties agree that there are no issues of material fact precluding summary judgment, and (2) in view of the lengthy delays occasioned by appeals we believe that our consideration of the alleged restraints will expedite final determination of this case.

Section 1 of the Sherman Act has consistently been held to prohibit only those restraints of trade which are "unreasonable."

"A restraint may be unreasonable either because a restraint otherwise reasonable is accompanied with a specific intent to accomplish a forbidden restraint or because it falls within the class of restraints that are illegal per se." United States v. Columbia Steel Co., 334 U.S. 495, 522, 68 S.Ct. 1107, 1121, 92 L.Ed. 1533 (1948).

And, of course, a restraint of trade may be unreasonable if found to be so under the rule of reason, when that standard is applicable.

Plaintiff argues that because the practices complained of are per se violative of § 1, examination under the rule of reason is inappropriate. It argues, in short, that the practices are illegal as a matter of law.

With equal vigor defendant contends that the provisions attacked were ancillary to a valid licensing agreement, a reasonable business practice. See Addyston Pipe and Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). Kresge contends that it not only had the right, but the duty to exercise "quality control" over the use of its registered trade name. Defendant argues that plaintiff's per se theory rests on an erroneous factual premise, i. e., that Hempfield and Kresge were competitors. Kresge denies that they were competitors in any sense; it argues that they were de facto partners, each complimenting the other to provide full service one-stop shopping.

Kresge also argues that if the food stores did not have a competitive pricing policy, then consumers shopping K-Mart food stores and finding their prices not in keeping with the K-Mart image would not only have shifted their allegiance from the food stores but would also cease to associate the K-Mart name with discount prices. Therefore, defendant seeks to justify the pricing requirements as ancillary and reasonable to the licensing of its trade name.

We believe that it is necessary to evaluate the agreements between Hempfield and Kresge in the broader context which led to their execution and implementation before proceeding to a seriatim consideration of the alleged restraints. This is because we believe it is necessary to establish a frame of reference by which the restraints can be judged. We will approach the problem by posing the following questions:

(1) What was the nature of the agreement between Hempfield and Kresge?

(2) Are the practices complained of to be examined under the rule of reason or does the per se doctrine properly apply?

(3) Were the alleged restraints violative of § 1?

A. The Nature of the Arrangement

Kresge, in its brief, states:

"It is impossible to 'peg' the K-Mart license agreements into any particular 'hole.' It is, of course, a license to use a registered trade name . . . Kresge, therefore, is required to maintain 'quality control' over the use of its name. It is similar to a 'franchise' agreement except that Kresge did not provide goods or serv-

844

ices to Hempfield, but rather operated a different type of store adjacently under the same registered trade name." (Defendant's Brief, p. 38).

■ We believe that despite the provision in both license agreements stating that "the parties do not intend this agreement to constitute a joint venture, partnership or lease . . ." defendant's analogy between its license agreements with Hempfield and franchise agreements is well taken. The fact that Kresge did not sell goods or services to Hempfield does not preclude a franchise type arrangement since that concept may apply to a method of doing business as well as to a method of distributing a particular product or line of products.

In the typical franchise arrangement a company (the franchisor) owns a trade mark or trade name which it licenses to others (the franchisees) to use upon the condition that the users conform their business to standards established by the licensor insofar as that business is associated with the trade mark or trade name. A franchisor may pursue that method for any one of a number of reasons. In this case, Kresge chose to license its trade name because it lacked any source of distribution for groceries and because of its lack of experience in the business of selling retail food.

Franchise agreements invariably require a cooperative effort between the licensor and the licensee. While the agreements both contain the provision referred to above that they are not to be construed in such a way as to create a partnership, we believe that the conclusion that a type of *de facto* partnership was created is inescapable.

At oral argument, counsel for defendant observed that

"While the agreement makes clear that we were not *de jure,* we were not legal partners obviously for the reasons that we did not want, either one of us, to be bound by the principles or agency or partnership law. But if you cut through the legalities of the situation you find what I say is the equivalent of an economic or *de facto* partnership where each has carved out, mutually and voluntarily, this sphere or area in which they are going to compete in a market already filled with other competitors filling the needs of the consumer who will purchase goods from both." (Tr. 6 Argument on Motion for Summary Judgment, Sept. 25, 1974).

We believe that the analogy between the present agreements and franchise arrangements is further strengthened by the facts surrounding the initiation of the Hempfield-Kresge relationship as well as many provisions in the agreements including, *inter alia,* (1) Hempfield agreed that upon termination of the license agreements it would discontinue all use of the K-Mart or any related name; (2) Hempfield agreed to pay Kresge license fees as a percentage of gross sales in excess of a specified figure; (3) the parties agreed to a common advertising arrangement to be directed by Kresge, the cost of which was to be shared by Hempfield; and (4) there was an ongoing commercial relationship between the parties not only as to license fees and advertising but also as to other areas of operation.

We have drawn this analogy only for purposes of evaluating the conduct complained of. We realize that branding any particular agreement as a licensing agreement, a franchising agreement or by any other term, is no cure-all for the problem we must address. However, we believe that it does create a necessary starting point from which we may now proceed to examine the alleged restraint in greater detail.

## B. *The Appropriate Standard*

In every case under § 1 of the Sherman Act there are two routes to a finding of illegality: critically analyzing the competitive effects and possible justification of the challenged practice; or subsuming it under one of the per se rules. Plaintiff insists that the former approach is unavailable here. Defend-

ant, on the other hand, contends that the practices cannot be summarily condemned under the per se doctrine for two related reasons.

First, defendant contends that the K-Mart merchandising concept is unique and that the courts lack sufficient experience with business relationships of the type created by the license agreements in question to permit application of the per se doctrine, citing United States v. Topco Associates, Inc., 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972), where the Court said:

> "It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act."

Secondly, defendant argues that the restrictions imposed on Hempfield are justified as ancillary to a lawful agreement which were necessary to protect legitimate business interests.

In Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403 (5th Cir. 1962), a trade-mark owner, Spring-Air Company sued Denison, one of its licensees, for costs of advertising and other fees claimed under a contract. Denison contended that the contract was unenforceable because its provisions violated the antitrust laws by dividing trade territories, fixing prices, restricting the licensee in its purchase of materials, prohibiting the licensee from manufacturing and selling competing products, requiring the licensee to use Spring-Air's specifications and restraining the licensee from the sale or use of products or materials upon termination of the contract. The Court adopted an approach which looked to the primary purpose of the contract:

> ". . . [I]f the primary purpose of the contract is lawful, e. g., to protect one in the fruits of his labor, and if the arrangement was actuated by or could be explained on the basis of legitimate business justification as opposed to the desire to increase market control through economic leverage, then the court will generally hold

any incidental restraint of trade, not harmful to competition of the public, to be lawful. (Citation omitted). Therefore, it is our duty to determine whether the general primary purpose of the contract under consideration was to protect Spring-Air in its product, and then determine more specifically whether the provisions of the contract complained of here violate any antitrust law." 308 F.2d at 408.

In Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), the Supreme Court made it clear that antitrust violations are not insulated from the antitrust laws merely because they are part of an otherwise legitimate franchise arrangement. In Timken, the United States charged that Timken, a domestic corporation, had conspired with two foreign corporations in each of which it had a financial interest to restrain interstate and foreign commerce in the manufacture and sale of antifriction bearings. The Court rejected any argument that common ownership liberated the defendant from the impact of the antitrust laws. It continued:

> "Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a 'joint venture.' Perhaps every agreement and combination to restrain trade could be so labeled.

> "Nor can the restraints of trade be justified as reasonable steps taken to implement a valid trademark licensing system, even if we assume with appellant that it is the owner of the trademark 'Timken' in the trade areas allocated to the British and French corporations. Appellant's premise that the trade restraints are only incidental to the trademark contracts is refuted by the District Court's finding that the 'trade mark provisions [in the agreements] were subsidiary and secondary to the central purpose of allocating

trade territories.' Furthermore, while a trademark merely affords protection to a name, the agreements in the present case went far beyond protection of the name 'Timken' and provided for control of the manufacture and sale of antifriction bearings whether carrying the mark or not." 341 U.S. at 598–599, 71 S.Ct. at 974.

■■ Therefore, despite our previous conclusion that the license agreements here created a type of *de facto* partnership, the holding in *Timken* precludes use of this finding as a possible justification for the restraints complained of. The determinative question then is whether the restraints can be justified under the ancillary restraints doctrine as announced in United States v. Columbia Pictures Corp., 189 F.Supp. 153, 178 (S.D.N.Y.1960) :

> "Where challenged conduct is subservient or ancillary to a transaction which is itself legitimate, the decision is not determined by a per se rule. The doctrine of ancillary restraints is to be applied. It permits, as reasonable, a restraint which (1) is reasonably necessary to the legitimate primary purpose of the arrangement, and of no broader scope than reasonably necessary; (2) does not unreasonably affect competition in the market place; and (3) is not imposed by a party or parties with monopoly power."

To answer this question it is necessary to undertake a two-pronged inquiry: (1) What was the central purpose of the agreements in question; and (2) do the restraints meet the criteria of reasonableness under the ancillary restraints doctrine?

■■ In licensing its name to independent food store operators, Kresge was engaged in the business of selling an identity, i. e., a merchandiser selling quality items at discount prices. As such it had a valid interest in insuring

that Hempfield maintained that image as part of the overall K-Mart design. Plaintiff has never seriously argued that the primary purpose of the agreement was anything other than what defendant says it was—attracting customers into the K-Mart stores by providing convenient one-stop shopping and quality merchandise at low prices. Therefore, we find that the primary purpose of the license agreements in question was lawful.

■■■ This finding, of course, does not preclude condemnation of the individual restraints if those restraints cannot be justified as ancillary to the lawful licensing agreement. Before turning to consideration of those restraints we note that defendant must show that the restraints were necessary to protect the K-Mart image since it is apparent that it made no effort to control the identity, origin or uniformity of the goods sold by Hempfield.

### C. *Alleged Restraints*

#### 1. *Identical Prices on Like Items.*

Notwithstanding our decision that the ancillary restraints doctrine governs the present case we will address plaintiff's argument that the provisions contained in both license agreements which required Hempfield to sell like items at identical prices constitute price-fixing and are, therefore, illegal per se. In support of its argument, plaintiff has cited a multitude of Supreme Court cases which establish that price-fixing agreements, however patent or subtle, and regardless of their purpose or immediate effect, are illegal per se. See e. g., United States v. Trenton Potteries, Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). From these cases plaintiff concludes that "like a rose, price-fixing is price-fixing." [23]

23. See Oral Argument on Motions for Summary Judgment, September, 25, 1974, Tr. 47.

Plaintiff, therefore, reasons that inasmuch as prices were undeniably fixed, a per se violation is established.

 While it is now clear that schemes like the one here fixing maximum prices are per se illegal as well as those fixing minimum prices, Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed. 2d 998 (1968), defendant contends that plaintiff's per se theory is premised on an erroneous factual assumption, i. e., that Hempfield and Kresge were "competitors."

Decisional law has established that price-fixing within the intent of the Sherman Act is either horizontal (dealing with arrangements among competitors) or vertical (attempting to control resale prices). In this case it is immediately apparent that no vertical price-fixing exists. Therefore, the question narrows down to whether Hempfield and Kresge were competitors:

> "[B]efore we may say that such agreements (to fix prices, allocate territories, to tie in on sale patented with unpatented products and to boycott other competitors) are inherently unlawful, we must find that the agreements were made *between competitors*, actual or potential, dealing in competing products in a relevant market." United States v. Columbia Pictures Corp., 169 F.Supp. 888, 893 (S.D.N.Y.1959). (Emphasis added).

*Cf.* Seligson v. Plum Tree, Inc., 361 F. Supp. 748, 755 (E.D.Pa.1973). We find that Hempfield and Kresge were not competitors. In the first place, the Kresge department stores and the Hempfield grocery supermarkets were designed to sell entirely different kinds of merchandise. That was the reason for the agreements. The fact that somewhere between 2% and 5% of merchandise sold by Hempfield was also sold by defendant's stores does not, in our view, require a finding that Hempfield and Kresge were competitors. On the contrary we believe it shows they were not. Therefore, a holding that Hempfield and Kresge competed would ignore the intensely practical business realities which underlie the antitrust laws.

In his affidavit, Frank Zapalla, one of the Hempfield incorporators, states:

> "It was never our intention, or Kresge's, that in any sense we were to be competitors of each other, for under the arrangement, we were both to be selling under one roof and under the name of K-Mart entirely different kinds of merchandise."

 While plaintiff has relied almost exclusively on the per se theory, we have given careful consideration to this practice under the rule of reason. We conclude that the practice did not violate § 1. Our reasons are three-fold: (1) the practice could not adversely affect the prices of the goods subject thereto; (2) defendant had no position of market dominance; (3) we believe that the practice was reasonably necessary to protect the K-Mart image and avoid customer confusion.

### 2. *Competitive Prices in the Trade Area.*

 Plaintiff has argued that the license provisions which called for Hempfield to sell its goods in "a suitable price range and competitve or lower in price with the same or similar merchandise and products offered for sale in other discount food stores in the trading area" should be deemed price-fixing. However, for reasons previously given, we believe that these provisions are properly treated as allegations that Kresge interfered with Hempfield's ability to exercise its independent business judgment.

In agreements of this type, there will inevitably be some interference with the licensee's unfettered discretion. The question here is whether that interference went too far? We think not.

In our view, these provisions did not require anything that Hempfield would not have had to do in any event. Kresge was merely protecting itself and the K-Mart image by requiring its licensee to remain competitive. Furthermore we find that the charge that Hempfield was used as a "loss leader" to attract customers to defendant's store is not substantiated by the record. Plaintiff has stated that Hempfield followed Fox Grocery Company's gross profits pricing structure.

While it is true that plaintiff alleges that at various times Hempfield was required to sell merchandise at prices lower than those determined in accordance with the Fox guidelines, we do not believe that there is anything approaching an illegal restraint of trade.

### 3. Limitations of Merchandise Hempfield was Permitted to Sell.

We find that in the circumstances which gave rise to the agreements challenged here, it was clear that both parties contemplated that each would engage in the sale of different types of merchandise. Kresge had an obvious reason for not wanting Hempfield to sell merchandise which was also sold in its stores and we find that under the facts presented here the restraint was clearly justified.

### 4. Prohibition of Fair Trade Agreements.

Under Pennsylvania's Fair Trade Act of 1935, 73 P.S. § 7 et seq., contracts establishing minimum prices for the resale of a trademarked or similarly identified commodity, in free competition with products of the same general class produced or distributed by others are not illegal. See P.L.E. Trade and Commerce, § 5.

Plaintiff contends that the license agreements, by prohibiting Hempfield from entering into fair trade agreements with any party, unreasonably restrained trade by controlling and interfering with the prices at which Hempfield sold its goods at retail to the consuming public.

We find that this provision was not anti-competitive. We, therefore, feel that it is justifiable as ancillary to the basic purpose of the licensing agreements.

### 5. Use of Trade Stamps.

The license agreements provided that Hempfield was not to issue trade stamps without the express permission of Kresge. We believe that defendant had a valid interest in insuring that its licensees adopt a uniform policy with respect to the issuance of trading stamps. We, therefore, hold that this provision did not constitute an unreasonable restraint of trade.

### 6. Alleged Tie.

In Count II of the Complaint plaintiff alleges, inter alia:

"24. The License Agreement attached hereto as Exhibit 2 constitutes a contract in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, and in violation of Section 3 of the Clayton Act, in that defendant tied to the licensing of its service tradename, and as a condition of the granting thereof, the requirement that the Bankrupt lease from it fixtures and equipment which the Bankrupt could have purchased or leased from others.

"25. Said tying policy of defendant tends to substantially lessen competition in the leasing and selling of such fixtures and equipment."

Defendant contends that it purchased the fixtures and equipment for this one store at the specific request of, and as an accomodation to, Frank Zapalla. However, notwithstanding this defense, we do not believe that a substantial amount of interstate commerce was affected by this practice. See Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2d Cir. 1964).

A tying arrangement is an agreement under which a vendor will sell one product only if the purchaser agrees to buy an independent product as well. In order to find such agreements unreasonable in and of themselves, two conditions must be found to exist: (1) the defendant must have sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product; and (2) a not insubstantial amount of interstate commerce must be involved. See Susser v. Carvel Corp., 332 F.2d 505, 518 (2d Cir. 1964), cert. denied, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965).

We find that the conduct complained of did not have a substantial affect on commerce. See Lieberthal v. North Country Lanes, Inc., *supra*. In our view, this condition was at most an incidental restraint of trade.

### Conclusion

After careful consideration of the motions before us, we have reached the following conclusions:

(1) The conduct complained of did not occur in the flow of interstate commerce; nor did it substantially affect interstate commerce. Therefore, the court does not have jurisdiction over the subject matter of this action.

(2) Notwithstanding the conclusion that the court lacks jurisdiction, we find that the license agreements challenged here had a legitimate primary purpose. We further find that the alleged restraints of trade were not unreasonable and are justifiable under the ancillary restraints doctrine.

(3) The counterclaims are properly left for final determination by the bankruptcy courts.

Therefore, it is appropriate to grant defendant's motion for summary judgment.[24]

It is so ordered.

24. We express no opinion as to whether Hempfield's participation in the conduct complained of precludes recovery by its trustee in bankruptcy as a matter of law.